**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| **THE HUMANE SOCIETY OF THE UNITED STATES and SOUND RIVERS, INC.,** | Case No. 4:15-cv-00109 |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| *vs*. | Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 *et seq.* |
| **THE HANOR COMPANY OF WISCONSIN, LLC,** | |
| Defendant. | |

Plaintiffs the Humane Society of the United States (HSUS) and Sound Rivers, Inc. (Sound Rivers), on behalf of their members, allege as follows:

## INTRODUCTION

1. This is a citizen enforcement action concerning ongoing violations of the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 *et seq.* (EPCRA or Act). The action challenges the unlawful failure of the Defendant, the Hanor Company of Wisconsin, LLC (Hanor), to provide mandatory emergency release notifications to state and local authorities of releases of the hazardous substance ammonia from a company-owned concentrated animal feeding operation (CAFO), located just outside of Rocky Mount, North Carolina. *See* 42 U.S.C. § 11004.

2. CAFOs are industrial facilities that produce a variety of dangerous air pollutants, including ammonia, hydrogen sulfide, and volatile organic compounds. When exposed to these pollutants, people and animals can suffer deleterious and sometimes extreme reactions, affecting their health, welfare, and quality of life. In light of substantial public health and safety concerns relating to the exposure of communities to harmful pollutants released by industrial facilities

COMPLAINT                                                                 1

such as CAFOs, Congress established EPCRA to ensure that the public and emergency response personnel would be provided with an immediate right of access to information about these releases.

3.    Specifically, section 304 of EPCRA, 42 U.S.C. § 11004, requires that emitters of a pollutant classified as an "extremely hazardous substance," must *immediately* notify relevant local emergency planning committees and state emergency planning commissions when their facility or facilities release in excess of the defined threshold amount for that pollutant. 42 U.S.C. § 11004. The notification, known as an emergency release notification, must include the name of the released pollutant, an estimate of the quantity released, and the time and duration of the release; soon thereafter, the releasing party must submit a second, more detailed, follow-up emergency notice. 42 U.S.C. §§ 11004(b)(2), (c); 40 C.F.R. § 355.40. Ammonia is classified as an extremely hazardous substance subject to these reporting obligations. 40 C.F.R. § 355, App. A.

4.    The information provided to communities through section 304 of EPCRA is significant and important to public health and safety. Exposure to airborne ammonia can cause eye discomfort, headaches, dizziness, and respiratory damage such as respiratory burning and scarring, hyperventilation, and reflex throat closure; the more extreme a person's exposure to airborne ammonia, the more compounded the health effects become. Accurately establishing if, where, and to what extent ammonia is being released from a facility, as EPCRA requires, supports informed decision-making by potentially exposed persons, including Plaintiffs' members and emergency response personnel.

5.    If a releasing party does not comply with EPCRA's emergency release notification requirements, the Act affords any person the right to bring a civil action to enforce the

COMPLAINT                                                                    2

obligations of the statute – as long as the person first notifies the releasing party of the violations, gives that party sixty days to remedy the failure, and the government is not commencing and diligently pursuing enforcement of the statute against the alleged violator. 42 U.S.C. §§ 11046 (a), (d)-(e); 40 CFR §§ 374.1, 374.3-374.4. These types of civil actions are referred to as citizen suits.

6.      In July of 2012, HSUS, on behalf of its affected members, notified Hanor that one of the company's CAFO facilities – hereinafter referred to as "Shellbank" – was regularly releasing ammonia in amounts that exceeded the reportable quantity for that pollutant, and that the emergency notification requirements of EPCRA obliged the company to immediately report those releases. On January 16, 2015, both Plaintiffs again provided Hanor with written notice regarding the ongoing regular releases of ammonia from the Shellbank facility, and Hanor's continued obligation to report those releases under EPCRA. After the close of this second noticing period, Plaintiffs confirmed with state and local governmental authorities that Hanor continues to violate EPCRA's emergency release notification requirements.

7.      Upon information and belief, at no time has Hanor corrected its violations or abated the pollution events that underlie these violations.

8.      No governmental authority is diligently pursuing an enforcement action against Hanor for this unlawful behavior. In 2005, Hanor – along with roughly 2,600 other animal producers representing 14,000 animal feeding operations nation-wide – entered into an administrative consent agreement with the U.S. Environmental Protection Agency (EPA) that purported to evaluate air pollution from CAFOs. That agreement does not diligently enforce EPCRA as it relates to the violations alleged herein.

9.     According to a recent study by the Johns Hopkins Center for a Livable Future, gaps in available data on releases of hazardous pollutants from CAFOs like Shellbank – gaps attributable in part to reporting failures under EPCRA – "compromise the ability of public health officials and scientists to characterize exposures and risks, and limit their ability to implement and evaluate interventions when appropriate." According to the study, limitations in data also negatively affect the degree and type of knowledge available to residents in affected communities.

10.    Plaintiffs seek declaratory relief establishing that Hanor has violated and remains in violation of EPCRA. Plaintiffs also seek an order from the Court directing Hanor to operate Shellbank in accordance with the law, including the timely submission of emergency release notifications to relevant state and local governmental authorities under section 304 of the Act. Absent such a declaration and court order directing compliance, Defendant will continue to violate EPCRA on a daily basis, as evidenced by its history of noncompliance with the Act. Finally, Plaintiffs request that the Court impose civil penalties and other remedial measures against Hanor, and award Plaintiffs their reasonable attorneys and expert witness fees and costs.

## JURISDICTION

11.    The Court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 11046(a) & (c).

12.    The Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 2201 *et seq*.

13.    On July 10, 2012, HSUS, on behalf of its affected members, provided detailed notice pursuant to the citizen suit provisions of EPCRA, 42 U.S.C. §§ 11046, of the violations alleged herein and of its intent to file a civil lawsuit against Hanor in the event the alleged violations continued at the end of sixty days. (Letter attached as Exhibit A and incorporated herein.) On

COMPLAINT                                                                                              4

January 16, 2015, both Plaintiffs again provided Hanor with written notice regarding its continued alleged violations of EPCRA due to the ongoing, unreported releases of ammonia from the Shellbank facility. (Letter attached as Exhibit B and incorporated herein.) Both notice letters were delivered via certified mail to Hanor, Hanor's registered agent, the United States Attorney General, the North Carolina Attorney General, the Administrator of the EPA, the Regional Administrator of EPA Region 4, and the Secretary of the North Carolina Department of Public Safety. *Id.*; *see also* 40 C.F.R. § 374.2(a).

14. More than sixty days have passed since Plaintiffs served these notice letters. Hanor has not corrected the violations described in the notice letters; no government authority is diligently pursuing an enforcement action to abate the violations alleged herein; and the violations are ongoing at this time and will continue absent judicial intervention.

## VENUE

15. Venue properly vests in this Court pursuant to 42 U.S.C. § 11046(b)(1) because the alleged violations of EPCRA occurred in the Eastern District of North Carolina.

## PARTIES

16. Hanor is a foreign limited liability corporation organized under the laws of the state of Wisconsin and registered to do business in the state of North Carolina. Hanor maintains its principal place of business in the state of Wisconsin. Hanor's primary business is swine production. Hanor is a large, multi-state corporation with over 500 employees. Hanor's registered agent in North Carolina is National Corporate Research, Ltd., located at 212 South Tryon Street, Suite 1000, Charlotte, NC 28281. Hanor's principal office is located in Spring Green, Wisconsin.

17. Hanor is the owner and operator of Shellbank.

COMPLAINT                                                                 5

18.     Shellbank is a large industrial swine CAFO that confines an estimated 2,150 farrow-to-feeder swine and 6,400 feeder-to-finish swine.

19.     Shellbank is located adjacent to the Tar River and in the Rocky Mount region, at approximately 7111 NC 97W, Battleboro, NC 27809.

20.     Hanor is a "person" within the meaning of EPCRA because it is a "corporation." 42 U.S.C. § 11049(7).

21.     Hanor is an "owner or operator," for purposes of 42 U.S.C. § 11046(a)(1)(A), because it owns and operates Shellbank.

22.     Shellbank, including its buildings, equipment, structures, and other appurtenances, is a "facility" under EPCRA because it is a stationary, single site owned and operated by Hanor. 42 U.S.C. § 11049(4).

23.     Plaintiff HSUS is a nonprofit organization headquartered in the District of Columbia and incorporated in the State of Delaware.  HSUS is the nation's largest and most effective non-profit animal protection organization. With millions of members and constituents, the mission of HSUS is to create a humane and sustainable world for all animals, people, and communities. Pursuant to this mission, HSUS strives to, among other things, promote public safety; protect animals and their environment; prevent animal cruelty, exploitation, and neglect; and protect wildlife, habitat, and biodiversity. HSUS advocates against CAFOs as an unsustainable form of agriculture that harms animals, communities, and the environment. HSUS endeavors to ensure that its members are aware of and not injured by pollution from CAFOs, including hazardous air pollution.

24.     Plaintiff Sound Rivers is a non-profit corporation organized under the laws of the state of North Carolina and originally incorporated under the corporate name Pamlico-Tar River Foundation, Inc. (PTRF). The name change occurred on or about April 1, 2015, after PTRF sent

COMPLAINT                                                                                                          6

the January 2015 notice letter. Notwithstanding its change in name, Sound Rivers maintains the same principal place of business, primary contact information, and Executive Director as PTRF and as provided in the January 2015 notice letter. Sound Rivers further maintains the same tax identification number and state incorporation number.

25.     On April 1, 2015, the Neuse River Foundation merged into PTRF, combining two of the oldest conservation organizations in North Carolina. Sound Rivers continues the mission and purpose of both previous organizations, which is to monitor, protect, and enhance the Neuse and Tar-Pamlico Rivers and their watersheds. These watersheds cover more than 12,000 square miles and include the Pamlico Sound – a major component of the second largest estuary in the United States. Sound Rivers has three Riverkeepers who serve as investigators, advocates, and educators for the watersheds, and it represents the interests of its thousands of members and donors who live, visit, or love this beautiful region of North Carolina. Sound Rivers and its members seek to ensure clean, safe water, and an ecologically sound and healthy environment for today and for future generations.

26.     Plaintiffs bring this action on behalf of themselves and their members, including members who live and recreate near the Shellbank facility. Plaintiffs and their members have been and continue to be injured by Hanor's failure to comply with the emergency release notification requirements of EPCRA, including a failure to inform the public regarding the type and amount of hazardous substances released from Shellbank. These violations have prevented Plaintiffs and their members from obtaining information about the specific air pollutants released by Shellbank, infringing upon Plaintiffs' members' informational rights under EPCRA to know what hazardous air pollutants are permeating their communities, and to identify what precautions they can take to protect themselves, their families, and their animals. EPCRA, the Emergency

Planning and *Community Right-to-Know Act*, was enacted specifically to protect the interests that Hanor is violating.

27.     The informational, health, environmental, aesthetic, economic, and recreational interests of Plaintiffs' members have been, and will continue to be, adversely affected by Hanor's violations of EPCRA. Plaintiffs' members live and recreate near Shellbank, and are injured because, *inter alia*, they use and enjoy the outdoors, and breathe and otherwise come into contact with ambient air that is contaminated by releases of hazardous substances from Shellbank, including ammonia.

28.     Ammonia is a toxic chemical that negatively affects human health and can have a noxious odor. Lack of access to information about releases of ammonia from Shellbank adversely affects Plaintiffs' members' interests.

29.     Plaintiffs' members also recreate on and around the Tar River, a navigable waterway that borders Shellbank. Due to its proximity to Shellbank, the air around the Tar River is contaminated by releases of hazardous substances from Shellbank, and the river itself is subject to nutrient pollution impairment due to the deposition of ammonia-related air pollutants into the waterway. Plaintiffs' members' concern regarding releases of ammonia from Shellbank is augmented by lack of access to information about the extent of those releases, and causes Plaintiffs' members to curtail proximate outdoor and recreational activities.

30.     Reporting the releases of hazardous substances from Shellbank will provide Plaintiffs' members with knowledge regarding the quantity and type of pollutants being released from this facility, and an opportunity to use the information to weigh the risks of exposure and make educated choices with regards to their use and enjoyment of the surrounding environment. These members could and would take measures to protect themselves from exposure if they had access

COMPLAINT                                                                8

to the information required by EPCRA. Without access to this information, Plaintiffs' members derive less enjoyment from outdoor activities and experience reasonable concern about the potential for future harm. Plaintiffs' members' injuries are actual, concrete, ongoing, and particularized. The requested relief will redress these injuries because it will require Hanor to comply with its emergency release notification requirements under EPCRA and, in doing so, provide Plaintiffs' members with information regarding releases of hazardous pollutants from Shellbank, which will allow them to better protect their health and well-being, and the health and well-being of other potentially affected members.

31.     Specifically, Plaintiffs have individual members who reside in North Carolina and near the Shellbank facility, and who work and recreate in and near the area surrounding Shellbank, including on the Tar River. Plaintiffs' members have attempted to determine the potential for their exposure to the extremely hazardous substances emitted from Shellbank, but have been unable to do so because of Hanor's failure to report the facility's releases under EPCRA. This lack of knowledge adversely affects Plaintiffs' members, and is representative of the informational injuries sustained by other members of HSUS and Sound Rivers. For instance:

   a.   One of the Plaintiff groups' members lives and works near the Shellbank facility. The member is concerned about the extremely hazardous substances emitted by Shellbank, including concern about how those releases affect her health, and has attempted to locate information about the facility's releases. She has been unable to do so because of Hanor's failure to report the facility's releases under EPCRA. The member's informational, recreational, environmental, and aesthetic interests have been injured by Hanor's illegal omissions under EPCRA.

   b.   A separate member of one of the Plaintiff groups frequently recreates and

performs occupational duties near to the Shellbank facility and on the Tar River. The member is concerned about the extremely hazardous substances emitted by Shellbank, and how those pollutants could impact her health and the environment. The member has attempted to ascertain her potential exposure to the pollutants emitted by Shellbank, but has been unable to do so because of Hanor's failure to report the facility's releases under EPCRA. The member's informational, recreational, environmental, and aesthetic interests have been injured by Hanor's failure to comply with EPCRA.

c.  HSUS also has a member and employee who resides in North Carolina and works to support the equal enforcement of laws in the animal agricultural industry. The member works to educate residents in North Carolina, including HSUS members, about the animal agricultural industry, and to support the public's right of access to information about CAFOs in North Carolina. Access to information about releases of ammonia from CAFOs, including Shellbank, will allow her to better serve the HSUS membership by providing her with attested information that she may rely on to, for example, advise HSUS members about precautionary steps that they can take to protect themselves, their property, their families, and their animals from dangers posed by release of this pollutant. The member is considered an important resource for information regarding CAFOs and their impacts on animals, communities, and the environment. The member's informational interests under EPCRA have been injured by Hanor's failure to report.

d.  HSUS has a member of its staff who is a sixth-generation beef cattle farmer. As

part of his employment with HSUS, this employee advocates for sustainable farming practices, including practices that minimize the negative effects of animal agriculture on the health and welfare of communities and farmed animals, and that support smaller, sustainable family farms. These efforts are centrally important to HSUS's mission. The HSUS and this staff member are concerned about releases of extremely hazardous substances from Shellbank, and the risk that those releases pose to individuals and families that live near to the facility, including HSUS members. The HSUS believes that persons potentially impacted by these releases have the right to know about the pollutants to which they are being exposed. The failure of large confinement operations like Hanor to reasonably comply with environmental laws, such as EPCRA, is further deeply concerning to this employee and to HSUS as it puts smaller family farmers at a competitive disadvantage, which harms HSUS's interests in promoting sustainable agriculture.

32. HSUS and Sound Rivers have attempted to locate information about the pollutants emitted by Shellbank, but have been unable to do so because of Hanor's failure to report the facility's releases under EPCRA. Plaintiffs' and their members' informational interests under EPCRA have been injured by Hanor's failure to report.

33. Plaintiffs' organizational interests have also been injured by Hanor's violations of EPCRA. In particular, Plaintiffs' organizational purposes are adversely affected by Hanor's actions, which prevents Plaintiffs from obtaining access to significant information about releases of hazardous substances by Shellbank, including information that they would use to more effectively notify their membership of potential community health hazards, and to advocate on

COMPLAINT                                                                          11

behalf of their membership for improved air quality, public health advancements, welfare of rural communities, and health and welfare of animals.

34.     For example, HSUS has petitioned the EPA to regulate ammonia as a criteria pollutant under the Clean Air Act, and information regarding emissions of ammonia from CAFOs such as Shellbank will enable it to more effectively advocate for this and similar legal developments on behalf of itself and its membership. The requested relief will redress Plaintiffs' informational and organizational injuries because it will require Hanor to comply with its emergency release notification obligations under EPCRA.

35.     At all relevant times, Plaintiffs each are, and have been, a "person" within the meaning of EPCRA. 42 U.S.C. §§ 11046; 11049(7).

**LEGAL FRAMEWORK**

36.     EPCRA was enacted in 1987 to complement the federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), and to provide the public with an immediate right of access to fundamental information about releases of hazardous pollutants from facilities into the environment. 52 Fed. Reg. 13378, 13378. To meet this goal, EPCRA establishes a framework of state, regional, and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of a safety-threatening release. *Id.* at 13378-79.

37.     EPCRA is comprised of four major community planning and notification provisions. 42 U.S.C. §§ 11001-03 (emergency planning); 11004 (emergency release notification); 11021-22 (hazardous chemical storage reporting requirements); 11023 (toxic chemical release inventory). These provisions – which help increase the public's knowledge and access to information regarding hazardous pollutants at individual facilities, their uses, and any releases into the

environment – provide a mechanism to mitigate and otherwise protect communities from a pollutant's hazardous and potentially deleterious effect. The information is also important to emergency response and safety personnel who can use the information contained in the EPCRA reports to prepare for and address emergency situations, such as circumstances that may put community members' and animals' health and welfare at risk. Workers and animals inside of CAFOs, as well as nearby residents, wildlife, and other neighboring parties (including domestic animals), are often subjected to the greatest exposure from a facility's release of hazardous substances.

38.     Section 304 of EPCRA, 42 U.S.C. § 11004, includes an emergency release notification and reporting provision designed to guarantee that communities are alerted to all potentially injurious releases of hazardous and extremely hazardous substances from facilities in their region, and provided with the necessary information to respond to and otherwise protect themselves, their families, fellow community members, and the environment from the harmful effects of those releases.

39.     Specifically, section 304 of EPCRA establishes that all extremely hazardous substances that are released from facilities above certain threshold amounts must be adequately reported to the local emergency planning committee (LEPC) for any area likely to be affected by a release and the state emergency planning commission (SERC) for any state likely to be affected by the release. 42 U.S.C. § 11004(b)(1). Notice of such releases must be provided *immediately*, as described in section 304(b) of EPCRA, and must include the chemical name of the released substance, an estimate of the quantity of the substance released, and the time and duration of the release. *Id*. §§ 11004(b)(1)-(2); 40 C.F.R. § 355.40.

40.     As soon as practicable after providing an initial emergency release notification, the owner

or operator of the facility must also provide a detailed written follow-up emergency notice, again to both the relevant LEPC and SERC. 42 U.S.C. § 11004(c).

41.      A "release" subject to the requirements of EPCRA includes "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment…of any hazardous chemical, extremely hazardous substance, or toxic chemical." 42 U.S.C. § 11049(8).

42.      Ammonia is designated as an extremely hazardous substance under EPCRA, and the threshold at which a release of ammonia triggers EPCRA's emergency release notification provisions is 100 pounds per day. 40 C.F.R. § 355, App. A. Ammonia is considered a chemical of concern because of its acute lethality, high production volume, and known risks. *Id*. In addition to being classified as an extremely hazardous substance under EPCRA, ammonia is classified as a "hazardous substance" under CERCLA. 42 U.S.C. § 9601(14)(E); 40 C.F.R. 302.4.

43.      A CAFO first produces ammonia in the facility's confinement barns as a result of animal excretion; ammonia, thereafter, continues to be released throughout the duration of the waste decomposition process. Ammonia, in at least small amounts, can be released from any farm that maintains animals. Unlike a standard farm, however, CAFOs are industrial operations that intensify and concentrate the amount of animal waste produced such that the ammonia from thousands of animals is perpetually released into the ambient air. A comparable production analogy would be to contaminants released from a burning match, which are easily and naturally dissipated, versus contaminants released from a coke smelter, which are continuous, substantial, and noxious. The distinction between facilities that can release harmful amounts of pollutants and those that cannot (due to, for example, size or other pollution reduction measures) is, in part,

Case 4:15-cv-00109-FL     Document 1     Filed 07/01/15     Page 14 of 28

why EPCRA maintains a threshold reporting amount: to ensure that only those facilities that release potentially harmful amounts of extremely hazardous substances are subject to EPCRA's reporting requirements.

44. Depending on concentration, duration of exposure, and sensitivity of the exposed individual, ammonia exposure can cause a range of adverse health effects in humans and animals.

45. The Agency for Toxic Substances and Disease Registry (ATSDR), a part of the Department of Health and Human Services, characterizes ammonia as a toxin. According to the ATSDR and the National Research Council's Acute Exposure Guideline Levels (AEGL) report for ammonia, exposure to airborne ammonia can, at lower concentrations, result in eye discomfort, odor irritation, headache, dizziness, upper respiratory and throat irritation, nasal dryness, and a "feeling of intoxication," while at higher concentrations it can cause moderate to severe respiratory effects, general discomfort, increased odor intensity, and increased irritation to the eyes, nose, throat, and chest. Eventually, as concentrations increase, health problems associated with ammonia exposure can progress to respiratory scarring, including tracheal and nasopharyngeal burns; bronchiolar/alveolar swelling; hyperventilation; reflex throat closure; and death.

46. EPA regulations provide the option of reduced reporting for "continuous releases" of reportable quantities of hazardous substances. *See* 40 C.F.R. §§ 302.8, 355.32. The reduced reporting option is elective and does not apply unless the releasing party makes a report and demonstrates therein that its reportable releases are continuous and stable in quantity and rate. *Id*.

47. Under EPCRA, any person may file a civil action against the owner or operator of a facility for illegal failure to submit a follow-up written emergency notice – as long the action is

Case 4:15-cv-00109-FL     Document 1     Filed 07/01/15     Page 15 of 28

undertaken upon compliance with EPCRA's citizen suit notice requirements, which include notifying the releasing party of the violations and giving the party sixty days to remedy the failure. 42 U.S.C. §§ 11046 (a), (d); 40 C.F.R. §§ 374.1, 374.3-374.4. This right can be restricted if the EPA or an authorized agency has commenced and is diligently pursuing an action to enforce or impose a civil penalty with regards to the subject violation. 42 U.S.C. § 11046(e).

48.     A civil action may seek civil penalties and injunctive relief. 42 U.S.C. § 11046(c). The civil penalty for a violation of the emergency release notification requirements of EPCRA is up to $37,500 per day for each day during which the violation continues. 42 U.S.C. § 11045(b); 40 C.F.R. § 19.4. The violation starts on the date that the owner or operator of a facility knew or should have known of the release of a reportable quantity of an extremely hazardous substance from the facility, and failed to comply with the Act's emergency release notification requirements.

### STATEMENT OF FACTS

#### *Releases of Reportable Quantities of Ammonia from Shellbank*

49.     Shellbank is an industrial swine production facility that confines an estimated 2,150 farrow-to-feeder swine (sows) and 6,400 feeder-to-finish swine; finish hogs and sows each weigh greater than 55 pounds. The facility utilizes an open animal waste treatment and storage impoundment system, often referred to as a "lagoon" system.

50.     Because of its size, Shellbank is categorized as a "large" CAFO, and is thus subject to the emergency release notification requirements of EPCRA. 40 C.F.R. § 355.31(g). The responsibility for "large" CAFOs that release in excess of 100 pounds of ammonia per day to report those releases under section 304 of EPCRA was reaffirmed by the EPA in December 2008. 73 Fed. Reg. 76948, 76952-53.

51.    EPCRA obligates Hanor, the owner and/or operator of Shellbank, to report releases of the extremely hazardous substance ammonia from Shellbank if those releases exceed 100 pounds per day. Each 24-hour period constitutes a "day" of violation.

52.    Hanor owns and operates CAFOs across the United States, and is aware of the statutory and regulatory framework within which these facilities must operate, including the requirements of EPCRA.

53.    Hanor has knowledge, actual or constructive, that ammonia is generated in the course of, or as a byproduct of, swine production, and is released from its industrial swine production facilities. This includes, but is not limited to, generation and/or release as the result of the design and operation of the confinement buildings, including the ventilation fans; the number of animals confined in those buildings; the large, open hog waste impoundments; and the facility's hog wastes management system, including the accumulation and movement of swine manure in animal confinement buildings.

54.    There is a large body of scientific literature establishing that CAFOs like Shellbank are major generators of ammonia. Hanor is, or should be, aware of this literature.

55.    Hanor is a member of the National Pork Producers Council (NPPC), a national swine industry lobbying and advocacy group. Along with an EPCRA reporting worksheet, the NPPC distributed to its members the "Koelsch and Stowell Ammonia Emissions Estimator," an ammonia-estimating methodology recommended by both the EPA and NPPC. NPPC continues to make that reporting worksheet, including the Koelsch and Stowell Ammonia Emissions Estimator, available on its website. *See* NPPC, *CERCLA-EPCRA Reporting Worksheet,* http://www.nppc.org/wp-content/uploads/Swine-EPCRA-Letter-Report-Worksheet.pdf    (last

COMPLAINT                                                                                                    17

visited June 23, 2015). Hanor's website links directly to the NPPC website. *See* Hanor Company, *Links*, http://www.hanorcompany.com/links.php (last visited June 23, 2015).

56.    Based on the allegations made in ¶¶ 49-55, *supra*, Hanor, as an industrial swine production corporation, has or reasonably should have had knowledge that its Shellbank facility releases in excess of 100 pounds of ammonia per day.

57.    At the very least, Hanor obtained actual knowledge of the ongoing and reportable releases of ammonia from Shellbank on or about July 10, 2012, the date Hanor received the original HSUS notice letter. As further explained in the notice letters, the Koelsch and Stowell Ammonia Emissions Estimator, the same ammonia emissions estimator the NPPC provided to its members, indicates that Shellbank regularly releases greater than 100 pounds of ammonia into the air per day, with high-end projections estimating Shellbank's releases of 600 pounds of ammonia per day – six times the daily EPCRA reporting threshold for ammonia.

58.    Given these facts, reasonable diligence directs that Hanor should have investigated and determined the amount of ammonia being released from Shellbank as of:

   a.    The date the facility achieved full operational and waste management capacity;

   b.    In December, 2008, when the EPA regulatorily reaffirmed the obligation for large CAFOs to report releases of extremely hazardous substances, including ammonia, under section 304 of EPCRA, *see* 73 Fed. Reg. 76948;

   c.    At the very latest, upon its receipt of the original HSUS notice letter in July 2012.

59.    Because Hanor knows or should have known that its Shellbank facility releases in excess of the reportable quantity of ammonia, Hanor is obligated, pursuant to EPCRA, to provide immediate notification of the releases to the relevant LEPC and SERC. 42 U.S.C. § 11004(a)-(b). "As soon as practicable" after providing its initial emergency release notification, EPCRA

further obligates Hanor to provide the relevant LEPC and SERC with a written follow-up notification. *Id.* § 11004(c).

60.     The LEPC contact for Edgecombe County is the Edgecombe County Office of Emergency Services.

61.     The SERC contact for North Carolina is the North Carolina Department of Public Safety.

62.     Upon information and belief, based upon Plaintiffs' inquiries to the LEPC and SERC, Hanor has not sufficiently notified, immediately or otherwise, the relevant LEPC or SERC of the releases of ammonia from Shellbank, pursuant to EPCRA and its implementing regulations.

63.     Upon information and belief, based upon Plaintiffs' inquiries to the LEPC and SERC, Hanor has not provided the relevant LEPC or SERC with any written follow-up notification of the releases of ammonia from Shellbank, pursuant to EPCRA and its implementing regulations.

64.     Upon information and belief, based upon Plaintiffs' direct inquiries to the LEPC and SERC, Hanor has also not provided the relevant LEPC or SERC with any "continuous release" report for the releases of ammonia from Shellbank, pursuant to EPCRA and its implementing regulations.

*The Animal Feeding Operation Consent Agreement and Final Order*

65.     In early 2005, after a multi-year drafting process with representatives from the CAFO industry – including NPPC – the EPA published a notice in the Federal Register that it was taking public comment on an administrative consent agreement and final order, referred to as the "Air Consent Agreement" or "Agreement." *See* Animal Feeding Operations Consent Agreement and Final Order, 70 Fed. Reg. 4958 (Jan. 31, 2005) (Air Consent Agreement attached as Exhibit C and incorporated herein). In the same publication, the EPA opened the Agreement for

COMPLAINT                                                                                   19

voluntary enrollment by any "animal feeding operation," or "AFO."[1] *Id.*

66.     The Air Consent Agreement is organized into two main sections: the Consent Agreement and the Monitoring Fund. Under the first section (the Consent Agreement), the EPA included a safe harbor in which it releases and covenants not to sue a participating AFO for civil violations of certain provisions of the Clean Air Act; section 103 of CERCLA; and section 304 of EPCRA. In exchange for the enforcement forebearance from the EPA, participating AFOs were to voluntarily enter into the Agreement and pay a nominal sum.

67.     The Air Consent Agreement principally details the safe harbor terms in three paragraphs, ¶ 26, ¶ 35, and ¶ 37. The safe harbor does not provide respondents with immunity from civil enforcement by citizen-litigants, like Plaintiffs and their members.

68.     Under the second section (the Monitoring Fund) participating AFOs were to share the "responsibility for funding an extensive, nationwide emissions monitoring study," to "develop[] … methodologies for estimating emissions from AFOs and … help AFOs … determine and comply with their regulatory responsibilities" under the Clean Air Act, CERCLA, and EPCRA. Correspondingly, participating AFOs were to pay approximately $2,500 per facility into a fund that would finance a two-year National Air Emissions Monitoring Study (NAEMS). Payments made into the NAEMS monitoring fund did "not constitute a fine or penalty and [were] not paid in settlement of any actual or potential liability for a fine or penalty."

69.     Within eighteen months from the conclusion of NAEMS, the EPA was to evaluate the data collected through the study and publish emission unit-specific estimating methodologies (Emissions-Estimating Methodologies or EEMs). Following publication and within a designated amount of time, participating parties were to use the estimating methodologies to assess releases

---

[1] For purposes of this Complaint, an "AFO" is the same thing as a "CAFO."

of aerial pollutants from the participating AFOs, and the Agreement was to be considered satisfied. Since the start of the process in 2005, EPA has failed to finalize any EEMs or bring participating parties into compliance with the Clean Air Act, CERCLA, and EPCRA.

70.     The Air Consent Agreement did not impose civil penalties under EPCRA with respect to any specific violation or violations of EPCRA.

71.     The Air Consent Agreement does not include generalized stipulated penalties in the event a party breaches the Agreement.

72.     The Air Consent Agreement establishes that "the statute of limitations for all claims covered by the release and covenant not to sue … will be tolled from the date this Agreement is approved by the [Environmental Appeals Board] until … December 31, 2011."

73.     To enter the Air Consent Agreement, an AFO owner or operator informed the EPA of its election to participate, and provided the EPA with certain information regarding the size and number of CAFOs that he or she designated for inclusion. The EPA used that generalized data to calculate penalties pursuant to the first section of the Agreement.

74.     During the public enrollment process, signed Air Consent Agreements were sent in large batches to the Environmental Appeals Board (EAB) for review and ratification. The EAB is a public, administrative tribunal that is part of, but independent from, the EPA.

75.     Shellbank is voluntarily enrolled in one of Hanor's Air Consent Agreements. The Hanor Agreement that includes the Shellbank facility was received by the EPA on or around July 27, 2005, and was ratified by the EAB on April 17, 2006 (Shellbank Agreement). The Shellbank Agreement was part of the second batch of signed Air Consent Agreements submitted to the EAB for ratification and approval; in total, seven hundred and one additional signed Agreements were submitted to the EAB along with the Shellbank Agreement.

76.     In aggregate, approximately 2,600 Air Consent Agreements, representing nearly 14,000 AFO facilities, were finalized.

77.     Upon information and belief, the Shellbank Agreement was not the result of, or created subsequent to, any litigation in federal or state court. Prior to or since its filing, the Shellbank Agreement has not been subject to any meaningful adjudicatory process, including a hearing, witness testimony, or application of the rules and standards of evidence.

78.     At the time the EPA made the Air Consent Agreement and notice of voluntary AFO enrollment available for public comment (2005), it estimated that it would take approximately four years from the start of NAEMS for: the terms of the Agreement to be reached; the safe harbor period for participating AFOs to close; and for relevant parties to come into compliance with the laws underlying the Agreement.

79.     It has been almost a decade since the EPA published the original Air Consent Agreement notice in the Federal Register, and none of this has happened. In fact, the EPA has yet to finalize any Emissions-Estimating Methodologies, one of the crucial steps in the process. In that time, the agricultural industry and EPA's own Science Advisory Board Animal Feeding Operation Emission Review Panel has criticized the validity and practical worth of the data obtained during the NAEMS study.

80.     Upon information and belief, since the EPA and Hanor entered into the Shellbank Agreement:

    a.   Daily reportable releases of ammonia from Shellbank have continued;

    b.   Hanor has not complied with its legal obligations under EPCRA regarding the reportable releases of ammonia from Shellbank, nor has it independently undertaken any corrective action at this facility;

COMPLAINT                                                                                          22

c.  Hanor has not taken any significant interim measures to protect public health and safety as it relates to the releases of ammonia from Shellbank;

d.  The EPA has not meaningfully engaged with Hanor regarding its continued non-compliance with EPCRA or the unreported releases of ammonia from its Shellbank facility;

e.  The EPA has not exercised due diligence and reasonable prudence with regards to Hanor or its execution of the Air Consent Agreement; and

f.  EPA has not assessed penalties against Hanor for its ongoing non-compliance with EPCRA at Shellbank.

81.  Further, upon information and belief, the National Pork Board, a quasi-governmental body of the United States Department of Agriculture established pursuant to The Pork Promotion, Research and Consumer Act of 1985, 7 U.S.C. §§ 4801-4819, paid the monitoring fund fee for pork producers participating in the Agreement, including Hanor.

82.  There are serious and widespread concerns throughout the United States regarding deficiencies in information regarding releases of extremely hazardous substances, including ammonia, from CAFOs. Scientists at John Hopkins University recently summarized the problem:

Despite literature associating AFOs with compromised air quality and residential proximity to AFOs with adverse health outcomes, availability of information concerning AFO airborne hazardous releases ranged from limited to nonexistent across the states that we examined….These data gaps compromise the ability of public health officials and scientists to characterize exposures and risks, and limit their ability to implement and evaluate interventions when appropriate. The lack of data also means that information on AFO hazardous releases is not available to

COMPLAINT                                                                                           23

residents of affected communities.

Smith, Rubenstein & Nachman, Availability of Information about Airborne Hazardous Releases from Animal Feeding Operations, 8(12) PLoS ONE e85342, at *8 (2013), *available at* http://www.plosone.org/article/fetchObject.action?uri=info%3Adoi%2F10.1371%2Fjournal.pone.0085342&representation=PDF.

## CAUSE OF ACTION

## VIOLATION OF EPCRA:

**FAILURE TO SUBMIT IMMEDIATE OR FOLLOW-UP EMERGENCY RELEASE NOTIFICATIONS PURSUANT TO 42 U.S.C. § 11004.**

83.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

84.    Section 304 of EPCRA, 42 U.S.C. § 11004, provides a mechanism to alert communities as well as state and local authorities that an extremely hazardous substance has been released from a facility, and that a response action may be necessary to prevent deaths or injuries to emergency responders, facility personnel, and local community members. A delay or failure to provide a required emergency release notification could pose serious threats to human health and the environment and seriously hamper the governments' response to an emergency event.

85.    For at least the past five years, Defendant's large CAFO, Shellbank – a facility subject to the requirements of EPCRA – has released and continues to release in excess of 100 pounds of the hazardous substance ammonia per day into the environment. Those releases are subject to the emergency notification requirements of EPCRA, 42 U.S.C. § 11004, and its applicable regulations, 40 C.F.R. Part 355, App. A.

86.     For at least the past five years, Defendant has known, or should have known, that Shellbank was releasing and continues to release reportable quantities of the extremely hazardous substance ammonia on a daily basis.

87.     For at least the past five years, Defendant has known, or should have known, that the ongoing and unabated daily releases of ammonia from Shellbank exceeded and continues to exceed the reportable quantity of 100 pounds per day for that substance.

88.     Since at least the date of receipt of the original HSUS notice letter, on or around July 10, 2012, Defendant has possessed actual knowledge about the ongoing and unabated nature of the reportable releases of ammonia from Shellbank, but has remained in continuous, daily and ongoing noncompliance with the emergency release notification provisions of EPCRA.

89.      Defendant has not submitted any initial emergency release notification(s) to the relevant LEPC and SERC concerning releases of reportable quantities of ammonia from Shellbank. 42 U.S.C. § 11004(b).

90.     Defendant has not submitted any written follow-up notification(s) or supplementation(s) to the relevant LEPC and SERC concerning releases of reportable quantities of ammonia from Shellbank. 42 U.S.C. § 11004(c).

91.     By knowingly releasing and continuing to release a reportable quantity of ammonia into the environment and failing to timely report such releases to designated state and local authorities, Defendant is in violation of EPCRA. 42 U.S.C. § 11004.

92.     Defendant's repeated daily violations of the emergency release notification requirements of EPCRA are ongoing and unabated.

93.     Defendant's repeated releases constitute a continuing series of acts such that each day Hanor fails to submit an emergency release notification subject to section 304 of EPCRA

Case 4:15-cv-00109-FL     Document 1     Filed 07/01/15     Page 25 of 28

constitutes a new act and a new violation of EPCRA. *See* 42 U.S.C. §§ 11045(b); 11046(a). As a result, Defendant is liable for civil penalties of up to $37,500 per day of violation. 42 U.S.C. § 11045(b); 40 C.F.R. § 19.4. The maximum civil penalty for violating EPCRA on a daily basis for five years would be approximately $68,437,500.

94.     Congress provided citizens with the right to commence a civil action in federal court to enforce EPCRA against a party in violation of the statue, in the event the government cannot or will not require compliance. 42 U.S.C. § 11046.

95.     The Air Consent Agreement does not diligently enforce EPCRA as it relates to the violations alleged herein. The EPA is not diligently executing the Air Consent Agreement, generally or as it relates to Shellbank, nor is the EPA pursuing, diligently or otherwise, any other administrative order or legal action against Hanor as it relates to the violations alleged herein.

96.     There were no civil penalties imposed by the Air Consent Agreement relating to specific, future violations of EPCRA.

97.     Unless authorized by statute, EPA cannot relieve Defendant of its ongoing and future responsibility to comply with EPCRA. Congress has not, through EPCRA or any legislation, provided the agency with that authority.

98.     As demonstrated by its extensive history of emergency release notification violations, without the imposition of appropriate civil penalties and issuance of an injunction, Defendant will continue to violate EPCRA and thereby injure Plaintiffs absent an order from this court compelling compliance.

99.     Plaintiffs' members have been unable to determine the extent to which they are being exposed to ammonia as a result of releases of the extremely hazardous substance from Shellbank. Plaintiffs' and their members' interests, as detailed *supra*, are injured by Defendant's failure to

COMPLAINT                                                                                      26

submit timely and adequate emergency release notifications under EPCRA and will continue to be injured unless this court orders Defendant's compliance with EPCRA.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs prays that this Court:

1.      Declare that Hanor has violated and remains in violation of the emergency release notification requirements of EPCRA, as alleged herein.

2.      Declare that Hanor's violation of the emergency release notification requirements of EPCRA have injured Plaintiffs' and their members' interests, as alleged herein.

3.      Order Hanor to operate its Shellbank facility in accordance with the emergency release notification requirements of EPCRA.

4.      Order Hanor to immediately notify the Edgecombe County Office of Emergency Services (the designated LEPC contact for Edgecombe County) and the North Carolina Department of Public Safety (the designated SERC contact for North Carolina) of the releases of reportable quantities of ammonia from Shellbank.

5.      Order Hanor to file legally adequate written follow-up notifications with the Edgecombe County Office of Emergency Services and the North Carolina Department of Public Safety concerning the release of reportable quantities of ammonia from Shellbank.

6.      Order Hanor to pay appropriate civil penalties of up to $37,500 per day for each day that Hanor failed to abide by the EPCRA emergency release notification provisions.

7.      Order Hanor to pay Plaintiffs' reasonable attorneys' fees, expert witness fees, and costs incurred in prosecuting this action, pursuant to 42 U.S.C. § 11046(f).

**8.** Grant such other relief as the Court may deem just and proper.

Respectfully submitted this 1st day of July, 2015.

/s/ James L. Conner, II
Calhoun, Bhella & Sechrest, LLP
4819 Emperor Blvd., Suite 400
Durham, NC 27703
(919) 887-2607
(919) 827-8806 (Fax)
jconner@cbsattorneys.com
NC Bar No. 12365
Local Civil Rule 83.1 Counsel

/s/ Daniel C. Snyder
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St.
Eugene, OR 97401
(541) 344-3505
(541) 344-3516 (Fax)
dan@tebbuttlaw.com
OR Bar No. 105127, *Special Appearance*

/s/ Peter Brandt
The Humane Society of the United States
2100 L Street NW
Washington, DC 20037
(240) 388-5023
(202) 676-2357 (Fax)
pbrandt@humanesociety.org
DC Bar No. 982936, *Special Appearance*

/s/ Hannah Connor
The Humane Society of the United States
2100 L Street NW
Washington, DC 20037
(202) 676-2354
(202) 676-2357 (Fax)
hconnor@humanesociety.org
DC Bar No. 1014143, *Special Appearance*

*Counsel for Plaintiffs*

COMPLAINT                                                                    28