**THE HUMANE SOCIETY OF THE UNITED STATES and SOUND RIVERS, INC.,**
Plaintiffs,

*vs*.

**THE HANOR COMPANY OF WISCONSIN, LLC,**
Defendant.

## PLAINTIFFS EXHIBIT A
to their Complaint for Declaratory and Injunctive Relief and Civil Penalties

July 10, 2012 letter Re: Notice of Intent to Sue for Violations of the Emergency Planning and Community Right-to-Know Act



Eric L. Bernthal, Esq.
*Chair of the Board*

Jennifer Leaning, M.D., S.M.H.
*Vice Chair*

Kathleen M. Linehan, Esq.
*Board Treasurer*

Wayne Pacelle
*President & CEO*

Michael Markarian
*Chief Program & Policy Officer*

Laura Maloney
*Chief Operating Officer*

G. Thomas Waite III
*Treasurer & CFO*

Andrew N. Rowan, Ph.D.
*Chief International Officer
& Chief Scientific Officer*

Roger A. Kindler
*General Counsel
Vice President & CLO*

Janet D. Frake
*Secretary*

**DIRECTORS**

Jeffrey J. Arciniaco
Eric L. Bernthal, Esq.
Michael J. Blackwell, D.V.M., M.P.H.
Jerry Cesak
James Costos
Anita W. Coupe, Esq.
Neil B. Fang, Esq., CPA
Jane Greenspun Gale
Cathy Kangas
Jonathan D. Kaufelt, Esq.
Paula A. Kislak, D.V.M.
Jennifer Leaning, M.D, S.M.H.
Kathleen M. Linehan, Esq.
John Mackey
Mary I. Max
Patrick L. McDonnell
Judy Ney
Sharon Lee Patrick
Judy J. Peil
Marian G. Probst
Jonathan M. Ratner
Joshua S. Reichert, Ph.D.
Walter J. Stewart, Esq.
Andrew Weinstein
Jason Weiss
David O. Wiebers, M.D.
Lona Williams

*Via Certified Mail -Return Receipt Requested*

July 10, 2012

The Hanor Company of Wisconsin
E 4614 Highway 14-60
Spring Green, Wisconsin 53588

Registered Agent
National Corporate Research, LTD.
176 Mine Lake Court, Suite 100
Raleigh, North Carolina 27615

RE:  **Notice of Intent to Sue for Violations of the Emergency Planning and Community Right-to-Know Act**

The Humane Society of the United States ("The HSUS") hereby provides notice of its intent to file a citizen suit on behalf of itself and its members for violations of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11001, *et seq.* ("notice letter"). Specifically, as further detailed below, the Shellbank Farm ("Shellbank") has in the past released, and continues to release, in excess of 100 pounds of ammonia gas into the air per day without adequately reporting those releases to potentially impacted states and communities in accordance with Section 304 of EPCRA.[1] Shellbank is a large industrial swine production facility, also known as a "concentrated animal feeding operation" or a "CAFO," that is owned or otherwise operated by the Hanor Company of Wisconsin ("Hanor").

Shellbank is in Edgecombe County in the town of Battleboro, North Carolina, a part of the historic City of Rocky Mount, and confines an average of over 8,000 head of hogs, including sows. Based in part on its affiliations with the National Pork Producers Council and other industry trade groups, its knowledge regarding industrial swine production, its obligation to comply with all relevant laws, and its access to accepted ammonia estimating methodologies and other air pollutant measurement methods for industrial swine production facilities, Hanor knew or should have reasonably been able to estimate that its facility, Shellbank, releases a minimum of between 558 and 659 pounds of the hazardous substance ammonia into the air per day, a quantity well in excess of the pollutant's 100 pound-per-day reportable quantity. As one of the largest industrial pork producers in the country, Hanor could have reasonably calculated and reported the daily volume of ammonia produced by this CAFO upon the facility achieving full operational and waste management capacities or at least as of January 2009.

---

[1] *See* 42 USC § 11004; 40 CFR § 302.4; 40 CFR § 355, App. A.

Celebrating Animals | Confronting Cruelty

Failure to adequately report the release of any hazardous substance or extremely hazardous substance above the substance's critical reportable quantity violates the emergency release reporting requirements of EPCRA while putting both communities and the environment at risk.[2] Human exposure to ammonia, which is listed as a "chemical[] of concern" because of its "acute lethality, high production volume, and known risks," can result in impairments ranging from respiratory distress to death.[3] This notice letter, provided pursuant to Section 326 of EPCRA, 42 U.S.C. § 11046, directs that at any time after sixty days from the date of service of this letter, The HSUS intends to file suit in federal district court seeking to enjoin the violations described below, to ensure the future compliance of Hanor with this important statutory provision, and to support the imposition of civil penalties.

I.  Background: The Emergency Planning and Community Right-to-Know Act

EPCRA, also known as Title III of the Superfund Amendments and Reauthorization Act ("SARA"), was enacted in 1987 to complement the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") by providing communities and the public with the immediate right of access to fundamental information about the release of hazardous pollutants into their homes, schools, churches and the environment.[4] To meet this goal, "EPCRA establishes a framework of state, regional and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of health-threatening release."[5] Specifically, EPCRA is comprised of four major community planning and notification provisions, including emergency planning, emergency release notification, and hazardous chemical storage reporting requirements.[6] These provisions, which "help increase the public's knowledge and access to information on chemicals [and hazardous pollutants] at individual facilities, their uses, and releases into the environment," provide a mechanism to mitigate and otherwise protect communities from the hazardous and sometimes toxic effects of pollutants on their populations and the environment.[7]

Of relevance to this notice letter, Section 304 of EPCRA includes an emergency notification provision that is designed to guarantee that communities are both alerted to all potentially injurious releases of hazardous and extremely hazardous substances from facilities in their region, and provided with the necessary information to respond to and otherwise protect themselves, other communities, and the environment from the harmful effects of those releases.[8] Often, traditional industrial operators, such as manufacturing and energy plants, are cited as the originators of these large releases of hazardous

---

[2] *Id.*

[3] 40 CFR § 355, App. A, Note f. *See also,* National Research Council, Air Emissions from Animal Feeding Operations: Current Knowledge, Future Needs, 66 (2003) [hereinafter *NRC Report*], *available at* http://www.nap.edu/catalog/10586.html.

[4] *See* H.R. Conf. Rep. No. 99-962 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3276, 3374 ("The Senate amendment and House amendment both establish programs to provide the public with important information on the hazardous chemicals in their communities, and to establish emergency planning and notification requirements which would protect the public in the event of a release of hazardous chemicals.").

[5] *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 86 (1998).

[6] *See* 42 USC § 11001, *et seq*.

[7] U.S. Env. Protection Agency (EPA), *The Emergency Planning and Community Right-to-Know Act: Fact Sheet,* EPA 550-F-00-004 (Mar. 2000).

[8] *See* 42 USC § 11004.

substances, but in many situations, it is the non-traditional industrial operators, such as industrialized animal producers, that can release just as much, if not more, of these pollutants on a domestic scale. For example, paired with a growth in meat consumption as well as the consolidation and industrialization of animal production methods, it is estimated that upwards of 50 percent of natural and anthropogenic ammonia emitted in the United States is derived from animal wastes and associated emissions,[9] while regional emissions of hydrogen sulfide from industrial animal feeding operations could, among other things, be "important contributors to the sulfur burden of the atmosphere" for areas with high densities of animal production.[10]

Specifically, in generating, disturbing, transferring and storing the waste products of hogs, a swine production facility, of the type at issue in this notice letter, can produce a number of hazardous substances, including the gaseous pollutants ammonia, hydrogen sulfide, nitrogen oxide ("NO") and volatile organic compounds ("VOCs").[11] Due to the quantity produced and potential impacts of these listed pollutants, of particular concern to public health and the environment is the continuous production of ammonia and hydrogen sulfide by large swine confinement operations. Indeed, since "[a]mmonia is a by-product of microbial decomposition of the organic nitrogen compounds in manure [including the proteins contained in solid waste and the urea contained in urine, and] …. [h]ydrogen sulfide …. is produced as manure decomposes anaerobically," a large swine operation that concentrates and raises hogs in a set of enclosed confinement buildings while collecting and storing large quantities of animal waste products on-site, including urine and feces, can generate sufficient hazardous air emissions to create a reasonable public concern about the impact of those emissions on neighboring communities and the environment.[12]

In particular, human or animal exposure to either ammonia or hydrogen sulfide can cause a range of health impairments and, in extreme circumstances, even death.[13] In humans, for example, "[t]he corrosive and exothermic properties of ammonia can result in immediate damage (severe irritation and burns) to the eyes, skin, and mucous membranes of the oral cavity and respiratory tract" with higher exposures causing extreme damage and potentially disabling, irreversible, or long-term effects.[14] Similar impairments and acute lethality have been exhibited in animals exposed to variable concentrations of ammonia.[15] Comparably, exposing human and animal populations to hydrogen sulfide, a known irritant and asphyxiant, can result in respiratory irritation, fatigue, and failure, nausea, memory loss, loss of consciousness, paralysis of the olfactory nerve, and, potentially, death.[16]

---

[9] *NRC Report*, *supra* note 3, at 52.

[10] *Id*. at 55.

[11] *See* CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms, 73 Fed. Reg. 76,948, 76,950 (Dec. 18, 2008) [hereinafter *2008 CERCLA/ECPRA Rule*].

[12] *See, e.g.,* Jessica Blunden and Viney Aneja, *Characterizing Ammonia and Hydrogen Sulfide Emissions from Swine Waste Treatment Lagoons in North Carolina*, 42 Atmospheric Environment 3277, 3278 (2008).

[13] *See generally, NRC Report*, *supra* note 3.

[14] National Resource Council, Acute Exposure Guideline Levels for Selected Airborne Chemicals: Vol. 6, 59, 75 (2007), *available at* http://www.nap.edu/catalog/12018 html.

[15] *Id*. at 60.

[16] *See* National Resource Council, Acute Exposure Guideline Levels for Selected Airborne Chemicals, Vol. 9, 174-180 (2010), *available at* http://www.nap.edu/catalog/12978 html.

Further, exposure of the nitrogen in ammonia or the sulfur in hydrogen sulfide to environmental mediums can result in extensive environmental impairment, including deterioration of air quality and atmospheric visibility, increases in greenhouse effects, impacts to species biodiversity, increases in the acidity of the soils, and eutrophication[17] of waters through decomposition.[18] Due to these known and anticipated risks, the release of these hazardous substances from facilities can cause substantial harm to human health and the environment. Therefore, from a public health standpoint, knowledge regarding the releases of these and other hazardous substances is critically important for protecting community health and welfare. The EPCRA provisions are framed to ensure public accessibility to that fundamental knowledge.

## II. EPCRA Section 304 Reporting Requirements

### a. Section 304 Liability

An owner or operator of a "facility" from which any hazardous substance or Extremely Hazardous Substance ("EHS") is produced, used, or stored at or above a specified reportable quantity ("RQ") such that there is exposure of that pollutant to the off-site environment must report the release of that pollutant to state and local authorities in accordance with the procedures established through Section 304 of EPCRA.[19] What this means is that liability for reporting a "release" under EPCRA falls to the "owner or operator" of a "facility."[20] These terms have been construed broadly such that "facility" is defined to include "*all* buildings, equipment, structures, and other stationary items which are located on a single site or on continuous or adjacent sites and which are owned or operated by the same person (or by any person which controls, is controlled by, or under common control with, such person)."[21] Likewise, the "owner or operator" of a facility is any "person," including any "individual, trust, firm, […] corporation […], partnership, [or] association," that owns, operates, or otherwise controls, whether wholly or partially, a facility.[22]

Under EPCRA, the term "release" is similarly defined broadly to include "*any* spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment … of any hazardous chemical, extremely hazardous substance, or toxic chemical."[23]

---

[17] "Eutrophication" is "the process by which a body of water becomes enriched in dissolved nutrients (as phosphates [and nitrogen]) that stimulate the growth of aquatic plant life usually resulting in the depletion of dissolved oxygen." *Eutrophication*, Dictionary.com, http://www.merriam-webster.com/dictionary/eutrophication (last visited Apr. 30, 2012). The increase in the nutrients nitrogen and phosphorus to water resources is considered one of the leading causes of domestic water quality impairment. *See* EPA, National Water Quality Inventory: Report to Congress, 2002 Reporting Cycle, EPA 841-R-07-001, (Oct. 2007), *available at* http://water.epa.gov/lawsregs/guidance/cwa/305b/upload/2007_10_15_305b_2002report_report2002305b.pdf.

[18] *See NRC Report*, *supra* note 3, at 52, 55, 69-71.

[19] 42 USC § 11004. *See also*, 40 CFR §§ 355.30-33.

[20] 42 USC § 11004.

[21] 42 USC § 11049(4) (emphasis added).

[22] 42 USC § 11049(7). *See also*, 42 USC § 11049 (4); 42 USC § 9601(20); *Sierra Club v. Tyson Foods*, 299 F.Supp. 2d 693, 717 (W.D. Ky., 2003).

[23] 42 USC § 11049 (8) (emphasis added).

4

Taken with the definition of "facility," establishing the true measure of a "release" requires an aggregation of all of the sources of release for each pollutant at a facility (regardless of the locations of the individual sources on the facility), which means that in no case should the owner or operator of a facility separate releases from adjacent or contiguous parcels of a property when assessing potential liability under EPCRA.[24] As it relates to the facility at issue in this notice letter, for example, the "release" is the sum total of the relevant pollutants from all sources on the facility, including the confinement buildings, the waste management system, and the land application areas.[25]

The owner or operator of a facility is liable under Section 304 of EPCRA only if there is the release of a hazardous substance or an EHS at or above the RQ for that pollutant.[26] Under this statute, "hazardous substances" and EHSs are separate categorical terms (though one pollutant can fit into both categories) established through CERCLA and EPCRA.[27] Specifically, hazardous substances, also known as "CERCLA hazardous substances," are established under CERCLA Section 101(14), and are listed in the table in Title 40, Part 302 of the Code of Federal Regulations ("CFR").[28] EHSs, also known as "ECPRA EHSs," are defined by regulation in Appendix A of Title 40, Part 355 of the CFR.[29] The regulatory hazardous substance and EHS lists also contain the "reportable quantities," or the minimum amount of a hazardous substance or EHS that triggers release reporting requirements, for each of the listed pollutants.[30]

In both cases, the pollutants included in these lists have been selected because of the hazardous and potentially irreversible effects on humans and the environment.[31] As it relates to the facility at issue in this notice letter, ammonia is defined as a hazardous substance and as an EHS, and it maintains a RQ of 100 pounds of release per 24-hour period.[32] A note on the designation of ammonia as an EHS confirms that the reason for instituting a 100 pound RQ designation for this pollutant is "because of [its] acute lethality, high production volume, and known risk[s]," which cause it to be labeled a "chemical[] of concern."[33]

---

[24] *See* 40 CFR §§ 355.14, 370.14.

[25] *See, e.g., Sierra Club v. Tyson Foods*, *supra* note 22, at 708; *Sierra Club v. Seaboard Farms*, 387 F.3d 1167, 1172-1173 (10th Cir. 2004).

[26] *See* 42 USC § 11004(a).

[27] *See* 40 CFR § 302.4; 40 CFR § 355, App. A.

[28] *See* 40 CFR § 302.4.

[29] *See* 40 CFR § 355, App. A.

[30] *See* 40 CFR § 302.4; 40 C.F.R. § 355, App. A. *See also*, 42 USC § 9602(b).

[31] *See Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) Hazardous Substances*, EPA, http://www.epa.gov/oem/content/hazsubs/cercsubs.htm (last visited Apr. 30, 2012) ("[H]azardous substances are substances that are considered severely harmful to human health and the environment. Many are commonly used substances which are harmless in their normal uses, but are quite dangerous when released.").

[32] *See* 40 CFR § 302.4; 40 CFR § 355, App. A. *See also*, 42 USC § 9602(b).

[33] 40 CFR § 355, App. A, Note f.

### b. Reporting Requirements

Upon the release of any hazardous substance or EHS above the RQ from a facility,[34] the owner or operator of that facility must *"immediately"* notify state and local officials of that release.[35] Providing notice through reporting is a multi-step process that first requires the owner or operator of the releasing facility to verbally notify both the local emergency planning committee ("LEPC") of any area likely to be affected by the release and the state emergency response committee ("SERC") of all states likely to be affected by the release (and, in the case of tribal land, the tribal emergency response commission ("TERC")).[36] To sufficiently allow state and local authorities to understand and assess the level of risk generated by the release (and to comply with statutory requirements), the initial notice should include all of the information listed in Section 304(b)(2), including the type of hazardous substance released, an estimate of the quantity and time of the release, the environmental medium into which the release occurred, known or anticipated health risks associated with the release, and any "[p]roper precautions to take as a result of the release."[37]

After and in addition to the initial verbal notice, the owner or operator liable for the release must "provide a written followup [sic] emergency notice (or notices, […]) setting forth and updating the information" included in the initial reported, as well as supplementing the information with "actions taken to respond to and contain the release, […] any known or anticipated acute or chronic health risks associated with the release, and […] where appropriate, advice regarding medical attention necessary for exposed individuals."[38] This written notice should expand on the information initially reported in the verbal notice by clarifying details about the release, including the quantity of pollutants released, and any expected impacts to human health and the environment that may result from that release.[39] Like the initial verbal notification, the follow-up written notification must also be submitted to both the LEPC and the SERC.[40]

Generally, emergency release notification requirements are triggered by the release of one or a number of hazardous substances on a per occurrence basis (thereby requiring an emergency notification for each release).[41] However, the U.S. Environmental Protection Agency ("EPA") provides a reduced reporting option for operations that release hazardous substances on a "continuous" basis.[42] This reduced

---

[34] EPCRA includes a reporting exemption under Section 304 for releases of hazardous substances from animal waste into the air from CAFOs falling below the large CAFO threshold, as established under relevant Clean Water Act National Pollution Discharge Elimination System regulations. *See* 40 CFR § 355.31(g). As relevant to this notice letter, a swine facility is an EPCRA "large CAFO" if it confines 2,500 or more hogs weighing over 55 pounds or if it confines 10,000 or more hogs weighing less than 55 pounds. *Id.*

[35] 42 USC § 11004(b)(1) (emphasis added).

[36] *Id.*

[37] *Id.* at § 11004(b)(2). *See also*, 40 CFR §§ 355.40(a), 355.41.

[38] 42 USC § 11004(c).

[39] *Id*. *See also,* 40 CFR §§ 355.40 (b), 355.41, 355.42.

[40] *See* 42 USC § 11004(c).

[41] *Id.*

[42] *See* 40 CFR §§ 302.8, 355.32.

6

reporting option, referred to as the "continuous release reporting" option, does not eliminate the requirement of a facility to report, but rather provides a method for a facility to report ongoing releases that are "continuous and stable in quantity and rate" without mandating a report be submitted for each release event.[43]

Much like the reporting requirements detailed above, continuous release reporting also involves a multi-step process in which the continuously releasing party must first provide an "[i]nitial telephone notification," and then an "[i]nitial written notification within 30 days of the initial telephone notification" to both the LEPC and the SERC.[44] For the continuous release of a hazardous substance, as defined by CERCLA, the continuously releasing party must also comply with a third reporting requirement, which requires an additional "follow-up notification [to the appropriate EPA Regional Office] [w]ithin 30 days of the of the first anniversary date of the initial written notification."[45] Finally, should there be any "statistically significant increase" in any release rate, a "new release[s]," or any "change in the normal range of the release," the continuously releasing party must submit additional notifications to the appropriate SERC and the LEPC.[46]

  c. **Enforcement and Penalties**

EPCRA provides the government and citizens with a number of powerful enforcement tools. As it relates to Section 304, should an owner or operator of a facility fail to report the release of any hazardous substance or EHS, as described above, then that party may be liable for civil and administrative penalties that can be as high as $37,500 per day for each day of the first violation to upwards of $107,500 per day for each day of any subsequent violations.[47] In addition, any person who "knowingly and willfully fails to provide notice in accordance with" EPCRA Section 304 may be liable for criminal charges of up to two years in prison and additional monetary penalties.[48] The owner or operator of a facility may also be civilly liable for frivolous "trade secret" claims with respect to reports of specific chemical identities, but since the Section 304 reporting information is not subject to any trade secret protections, an owner or operator is not subject to this additional penalty.[49]

EPCRA Section 326 provides the right for citizens,[50] such as members of The HSUS, to file civil actions in federal court to enforce EPCRA's statutory provisions and reporting requirements.[51] No citizen

---

[43] *Id. See also*, *2008 CERCLA/ECPRA Rule*, *supra* note 11, at 76,952 (Continuous release reporting is permissible for reporting the release of hazardous substances from animal waste at farms into the air); 40 CFR § 355.31.

[44] 40 CFR § 302.8(c). *See also*, 40 CFR § 355.32.

[45] 40 CFR §§ 302.8(c), (f).

[46] 40 CFR § 355.32. *See also,* 40 CFR § 302.8

[47] *See* 42 USC § 11045(b)(1)-(3); 40 CFR § 19.4, Table 1.

[48] *See* 42 USC § 11045(b)(4).

[49] *See* 42 USC §§ 11045(d), 11042(a).

[50] A "citizen" is "any person," including any "individual, trust, … [or] corporation." 42 USC § 11046(a)(1); 42 USC § 11049(7).

[51] *See* 42 USC § 11046.

7

action may be initiated in federal court, however, until at least "60 days after the plaintiff has given [valid] notice" of the alleged violation or violations.[52] This notice letter constitutes the commencement of that sixty-day period.

### III. Specific EPCRA Violations

Shellbank, as owned or otherwise operated by Hanor, is currently in violation of Section 304 of EPCRA for failing to provide sufficient emergency notifications to the relevant Edgecombe County LEPC and North Carolina SERC of its release of in excess of 100 pounds of ammonia per day into the air on a continuous basis. Despite a diligent search, we have not discovered any evidence that Hanor has ever provided adequate notice to either the county LEPC or the state SERC of the releases from this facility. Shellbank easily exceeds the relevant 2,500 head CAFO exemption threshold.[53] As further described below, upon achieving full operational and waste management capacity or since at least 2009, Hanor knew or should have known about its duty to adequately report the continuous daily releases above RQ of ammonia from the Shellbank CAFO facility into neighboring communities and the environment.

Specifically, Shellbank is an industrialized animal feeding operation that, when operating at capacity, confines an estimated population of 2150 farrow to feeder hogs and 6400 feeder to finish hogs. The facility, located at 7111 NC 97W, Battleboro, North Carolina, 27809 at Global Positioning System ("GPS") coordinates 35.9583 (latitude), -77.6878 (longitude), utilizes an open animal waste treatment and storage impoundment system, sometimes referred to as a "lagoon" system. Applying an accepted, straightforward, and commonly available ammonia estimating methodology for industrial swine production facilities, The HSUS estimates that on a continuous basis Shellbank far exceeds the RQ for ammonia, with the lagoon-related emissions alone averaging a minimum of between 558 pounds and 659 pounds of ammonia into the air every day, between five and six times the daily reporting threshold.[54]

As stated on the opening webpage of Hanor's website, Hanor is "one of the Nation's Premier Pork Producers."[55] As such, through simple due diligence, Hanor should not have only known of its responsibility under EPCRA to report RQ releases of the hazardous substance ammonia, but it also should have taken the necessary steps, including estimating and quantifying the dangerous air pollutants being released from its facilities, to determine if Shellbank was releasing in excess of the RQ for any reportable hazardous substance. For example, in establishing initial estimates for the Shellbank facility, Hanor could have applied the very same ammonia emission estimating methodology presently being utilized by The HSUS in assessing the ammonia emissions from this facility. That estimating methodology is recognized by both the EPA and the National Pork Producers Council ("NPPC") (a national swine industry lobbying and advocacy group), among other swine industry affiliates, and is commonly available, either directly or through reference, on each of these groups' organizational websites.[56] In fact, it is probable that Hanor

---

[52] 42 USC § 11046(d).

[53] *See* 40 CFR § 355.31(g).

[54] *See* R. Koelsch and R. Stowell, Ammonia Emissions Estimator (Feb. 23, 2009), http://water.unl.edu/c/document_library/get_file?folderId=67759&name=DLFE-4647.pdf.

[55] Hanor Company, http://www.hanorcompany.com/ (last visited June 07, 2012).

[56] *See* National Pork Producers Council, CERCLA-EPCRA Reporting Worksheet (Jan. 2009), *available at* http://www.nppc.org/wp-content/uploads/Swine-EPCRA-Letter-Report-Worksheet.pdf; EPA, Rule Change Provides Exemption from Reporting Requirements for Air Releases of Hazardous Substances from Farm Animal Waste: Fact Sheet (Jan. 2009), *available at* http://www.extension.iastate.edu/airquality/cerclaepcra/epafactsheetjan09.pdf.

8

could have even accessed this estimating methodology through its own website, which provides a direct link to and news feed from the NPPC website.[57]

As a committed member of the NPPC, it is also probable that Hanor has received numerous informational resources since at least 2009 addressing its legal requirements under EPCRA because NPPC has undeniably been very active with regards to the EPCRA Section 304 reporting requirements. In the past five years, for example, NPPC participated in a legal challenge to a 2008 administrative exemption for CAFO producers to CERCLA and some EPCRA reporting requirements, and it released to its members and the public numerous fact sheets and press releases on the EPCRA Section 304 reporting requirements of CAFOs.[58] Included within its outreach efforts, for example, is a fact sheet from 2009 that specifically states in the first sentence, "that all large CAFOs, including operations with 2,500 head of finishing swine or more, must notify state and local emergency response officials about ammonia and hydrogen sulfide emissions from their operations if they emit 100 pounds or more of these substances during any 24 hour period."[59] With an NPPC news feed right on its website, it is highly unlikely that Hanor missed all of these opportunities to learn more about and act on its EPCRA reporting requirements.

Because of our finding that the ammonia emissions from Shellbank exceed the relevant EPCRA 100 pound RQ five to six times over, we are perplexed by why Hanor has not yet fulfilled its duty to report the hazardous air emissions from this facility, which, at over 8,000 hogs, would clearly produce in excess of the relevant RQ for ammonia. Similar circumstances in which a defendant unreasonably, and potentially intentionally, ignored its legal requirements and "…avoid[ed] *knowledge by deliberately closing his eyes to what would otherwise be obvious or by failing to investigate if he is in possession of facts which cry out for investigation,"* have previously supported criminal conviction.[60] Consequently, with its general knowledge regarding swine production and operation; its specific knowledge regarding the swine facility in question; and its industry organizational affiliations, including affiliations with the NPPC, Hanor knew or should have known about the mandatory reporting requirements of EPCRA, and could have reasonably estimated, measured, and reported the ammonia emissions from its facility, Shellbank, to the relevant state and local authorities.

As a result, Hanor, with an environmental policy that includes a commitment to being "*the* leader in environmental stewardship," must bring Shellbank and all other facilities owned or operated by Hanor that release in excess of RQ of any hazardous substance or EHS into compliance with the critical Emergency Notification provisions contained in Section 304 of EPCRA.[61] At the end of the sixty-day notice period, The HSUS intends to file suit seeking civil penalties for daily and ongoing violations of EPCRA beginning no later than January 2009, to enjoin further violations of EPCRA Section 304, and to

---

[57] *See Links,* Hanor Company, http://www.hanorcompany.com/links.php (last visited June 7, 2012); *News & Video* Hanor Company, http://www hanorcompany.com/news.php (last visited June 7, 2012).

[58] *See, e.g.,* National Pork Producers Council, EPCRA Reporting Anniversary Reports, *available at* http://www.ilpork.com/displaycommon.cfm?an=1&subarticlenbr=124; National Pork Producers Council, CERCLA-ECPRA Fact Sheet (Jan. 14, 2009), *available at* http://www.nppc.org/wp-content/uploads/NPPC-EPCRA-Fact-Sheet-and-Detailed-Guidance.pdf; National Pork Producers Council, NPPC Sues EPA on Emissions Reporting Rule (Jan. 19, 2009), *available at* http://www.nppc.org/2009/01/nppc-sues-epa-on-emissions-reporting-rule/.

[59] National Pork Producers Council, CERCLA-ECPRA Fact Sheet (Jan. 14, 2009), *available at* http://www.nppc.org/wp-content/uploads/NPPC-EPCRA-Fact-Sheet-and-Detailed-Guidance.pdf.

[60] *See United States v. Buckley*, 934 F.2d 84, 87 (6th Cir. 1991) (emphasis in original).

[61] *Environmental Stewardship,* Hanor Company, http://www.hanorcompany.com/environment.php (last visited June 07, 2012) (emphasis added).

obtain any additional relief necessary to certify future compliance with this important statute. During the sixty-day notice period, parties will be available to discuss effective remedies and actions to certify the future compliance of Hanor with EPCRA. To the extent you have evidence that shows, contrary to the allegations in this letter, that the operation listed in this notice letter is in full compliance with applicable requirements, we urge you to provide that evidence to The HSUS.

The identification of relevant parties to this action is as follows:

### i. Noticed Parties

The Hanor Company of Wisconsin
E 4614 Highway 14-60
Spring Green, Wisconsin 53588

Registered Agent
National Corporate Research, LTD.
176 Mine Lake Court, Suite 100
Raleigh, North Carolina 27615

Eric Holder, Jr.
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Roy Cooper
North Carolina Attorney General
Office of the Attorney General
9001 Mail Service Center
Raleigh, North Carolina 27699

Lisa Jackson
Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Gwendolyn Keyes Fleming
Regional Administrator
U.S. Environmental Protection Agency, Region 4
Sam Nunn Atlanta Federal Center
61 Forsyth Street, S.W.
Atlanta, Georgia 30303

Reuben F. Young
Secretary
North Carolina Department of Public Safety
4201 Mail Service Center
Raleigh, North Carolina 27699

### ii. Noticing Parties

The Humane Society
of the United States
2100 L Street, N.W.
Washington, D.C. 20037
(202) 676-2354

### iii. Identification of Counsel

Hannah Connor
The Humane Society
of the United States
2100 L Street, NW
Washington, D.C. 20037
(202) 676-2354

Peter Brandt
The Humane Society
of the United States
2100 L Street, NW
Washington, D.C. 20037
(202) 452-1100

## IV. Conclusion

Communities, facilities, industry, and the environment must maintain a symbiotic relationship to remain healthy and viable. The societal expectation is that all members of a community will work together to sustain a livable future by limiting a community's exposure to potential risk. However, communal safety strategies only work if the parties who are causing the risk, by, for example, releasing hazardous substances into those communities and the surrounding environment, are taking proper precautions to effectively ensure that relevant information on the release of those pollutants is available to the public, and that those release activities are discontinued or otherwise mitigated. In recognizing that expectations may not always be fulfilled, EPCRA was created to ensure that communities are afforded the protections they deserve.

For the reasons set forth above, The HSUS intends to file suit at the end of the sixty-day notice period to enjoin further violations of EPCRA Section 304 and to obtain any additional relief necessary to certify future compliance with this important statute. If you have any questions regarding this notice, believe any of the statements in this notice letter to be in error, or wish to discuss a possible resolution of this matter, please contact me at (202) 676-2354 or hconnor@humanesociety.org.

Sincerely,

[signature redacted]

Hannah Connor, Esq.
The Humane Society of the United States

[signature redacted]

Peter Brandt, Esq.
The Humane Society of the United States

cc:

Eric Holder, Jr.
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Roy Cooper
North Carolina Attorney General
Office of the Attorney General
9001 Mail Service Center
Raleigh, North Carolina 27699

Lisa Jackson
Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Gwendolyn Keyes Fleming
Regional Administrator
U.S. Environmental Protection Agency, Region 4
Sam Nunn Atlanta Federal Center
61 Forsyth Street, S.W.
Atlanta, Georgia 30303

Reuben F. Young
Secretary
North Carolina Department of Public Safety
4201 Mail Service Center
Raleigh, North Carolina 27699