| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES and SOUND RIVERS, INC., )<br>)<br>*Plaintiffs*,<br>v.<br>THE HANOR COMPANY OF WISCONSIN, LLC,<br>*Defendant*. | PLAINTIFFS' REPLY TO HANOR'S RESPONSE TO NOVEMBER 3, 2017 SHOW CAUSE ORDER |

Pursuant to the Court's November 3, 2017 Order Directing Defendant to Show Cause ("Show Cause Order") (Dkt. No. 70), Plaintiffs The Humane Society of the United States and Sound Rivers, Inc. (collectively, "Plaintiffs"), by and through undersigned counsel, respectfully reply to Defendant The Hanor Company of Wisconsin, LLC's ("Hanor") response to the Show Cause Order.

This 22nd day of November 2017,

*/s/ James L. Conner, II*
James L. Conner, II (NC Bar No. 12365)
Calhoun, Bhella & Sechrest, LLP
4819 Emperor Blvd., Suite 400
Durham, NC 27703
(919) 887-2607 (telephone)
(919) 827-8806 (fax)
jconner@cbsattorneys.com
Local Civil Rule 83.1 Counsel
*Attorney for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ...............................................................................................................1

ARGUMENT......................................................................................................................1

    1.   The Court May Consider the EPA Office of Inspector General Report as
        Supplemental Authority. ..............................................................................................1

    2.   The Rule 56(d) Motion is Moot. ..................................................................................2

    3.   The OIG Report Reinforces Plaintiffs' Summary Judgment Arguments that
        EPA's Air Compliance Agreement is Not Diligent Pursuit..................................................7

        a.   The OIG Report shows that the Air Compliance Agreement has no
            "enforceable compliance aspects." ......................................................................7

        b.   The OIG Report shows that EPA is not acting "diligently." ..................................9

CONCLUSION..................................................................................................................13

# TABLE OF AUTHORITIES

**Cases**

*Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027 (D.C. Cir. 2007)
   (Rogers, J., dissenting) .................................................................................. 12

*Defenders of Wildlife v. Dept. of Interior*, 314 F. Supp. 2d 1 (D.D.C. 2004) ................................ 2

*Harned v. United States*, No. 13-CT-3068, 2016 U.S. Dist. LEXIS 36296
   (E.D.N.C. Mar. 21, 2016) ............................................................................... 3, 6

*Huggins v. Roach*, No. 5:15-CT-3002, 2016 U.S. Dist. LEXIS 127382
   (E.D.N.C. Aug. 1, 2016) ..................................................................................... 4

*In re Pharm. Indus. Avg. Wholesale Price Litig.*, 263 F. Supp. 2d 172 (D. Mass. 2003) ............... 2

*Jones v. City of Lakeland*, 224 F.3d 518 (6th Cir. 2000) ................................................................ 1

*Monsanto Co. v. ARE-108 Alexander Rd., LLC*, 632 Fed. Appx. 733 (4th Cir. 2015) ................... 5

*Moon v. United States*, No. 95-1797, 1996 U.S. App. LEXIS 14955
   (4th Cir. Jun. 21, 1996) ....................................................................................... 2

*Piney Run Pres. Ass'n v. Cty. Comm'rs of Carrol Cty.*, 523 F.3d 453 (4th Cir. 2008) .................. 8

*Pitroff v. United States*, No. 16-cv-522, 2017 U.S. Dist. LEXIS 133761
   (D.N.H. Aug. 22, 2017) ........................................................................... 8, 9, 10, 12

*Regions Bank v. Gator Equip. Rentals, LLC*, Civ. No. 15-5084,
   2016 U.S. Dist. LEXIS 112938 (E.D. La. Jul. 1, 2016) ...................................... 3, 6

*Silicon Knights, Inc. v. Epic Games, Inc.*, 917 F. Supp. 2d 503 (E.D.N.C. 2012) .......................... 2

*Tenn. Clean Water Network v. TVA*, No. 3:15-cv-00424,
   2017 U.S. Dist. LEXIS 135312 (M.D. Tenn. Aug. 4, 2017) .................................. 7

*Time Warner Cable Info. Servs. v. Duncan*, 656 F. Supp. 2d 565 (E.D.N.C. 2009) ...................... 2

**Statutes**

5 U.S.C. app. 3 § 4 ............................................................................................................... 3

**Other Authorities**

70 Fed. Reg. 4958 (Jan. 31, 2005) ...................................................................................... 9

U.S. Envtl. Prot. Agency Office of Inspector Gen. Rep. No. 17-P-0396, *Eleven Years
   After Agreement, EPA Has Not Developed Reliable Emission Estimation Methods
   to Determine Whether Animal Feeding Operations Comply With Clean Air Act
   and Other Statutes* (Sept. 19, 2017) ........................................................... passim

**Rules**

Fed. R. Evid. 201(c) ............................................................................................................ 2

# INTRODUCTION

Hanor attempts to keep alive its motion for Rule 56(d) relief primarily by trying to stop the Court from considering the EPA Office of Inspector General September 2017 report ("OIG Report").[1] Hanor likely asks the Court to ignore the report because Hanor cannot dispute the Court's statement in the Show Cause Order that the OIG Report "bears directly and comprehensively" on the EPA activities that are central to both Hanor's Rule 56(d) motion and Plaintiffs' motion for summary judgment. Show Cause Order (Dkt. No. 70). As explained below, the Court has the authority to consider the OIG Report. The report's findings, recommendations, and responses from EPA have two effects: they moot Hanor's motion for Rule 56(d) relief, and reinforce Plaintiffs' summary judgment arguments that the Air Compliance Agreement is neither an enforcement action, nor an action that EPA has diligently pursued.[2]

# ARGUMENT

**1. The Court May Consider the EPA Office of Inspector General Report as Supplemental Authority.**

Even though Hanor superficially contends that it "views the OIG Report favorably," *see* Hanor Resp. to Nov. 3, 2017 Order to Show Cause 3, 11 ("Hanor Resp. to Show Cause Order") (Dkt. No. 71), it spends several pages of its brief asking the Court not to consider the report, *id.*

---

[1] U.S. Envtl. Prot. Agency Office of Inspector Gen. Rep. No. 17-P-0396, *Eleven Years After Agreement, EPA Has Not Developed Reliable Emission Estimation Methods to Determine Whether Animal Feeding Operations Comply With Clean Air Act and Other Statutes* (Sept. 19, 2017) (Dkt. No. 69-2).

[2] Plaintiffs use "pursuit" and "prosecution" interchangeably. Hanor contends that this is wrong because "pursuing and obtaining an administrative order, as EPA has done with respect to Shellbank, ends the exercise of whether EPA has been diligent." Hanor Resp. to Order to Show Cause 10 n.10 (Dkt. No. 71). Hanor's construction of "diligent pursuit" creates a gigantic loophole in EPCRA's enforcement scheme, and contravenes existing case law by allowing an agency to block citizen suits "without ever actually requiring a facility's compliance." *See* Pls.' Reply 10 & n.9 (Dkt. No. 60) (citing *Jones v. City of Lakeland*, 224 F.3d 518, 522 & n.1 (6th Cir. 2000) (no diligent prosecution when agency fails to require some form of compliance)).

1

at 1-3. Hanor's request that the Court put its head in the sand and ignore a thoroughly researched agency report that "bears directly and comprehensively" on the parties' motions, *see* Show Cause Order (Dkt No. 70), suggests that Hanor may not view the OIG Report as favorably as it claims. In any event, the Court has broad leeway to act on its own initiative to notice agency documents, including as suggested supplemental authority. *See, e.g.*, *Time Warner Cable Info. Servs. v. Duncan*, 656 F. Supp. 2d 565, 577 (E.D.N.C. 2009) (accepting as "appropriate" a supplemental authority notice of a North Carolina Rural Electric Authority order); Fed. R. Evid. 201(c) (court may *sua sponte* take judicial notice).[3] Several other district courts have considered Inspector General reports through the vehicle of supplemental authority. *See, e.g.*, *Defenders of Wildlife v. Dept. of Interior*, 314 F. Supp. 2d 1, 17 n.18 (D.D.C. 2004); *In re Pharm. Indus. Avg. Wholesale Price Litig.*, 263 F. Supp. 2d 172, 180 n.6 (D. Mass. 2003).

   **2. The Rule 56(d) Motion is Moot.**

Hanor does not identify which issues from its original request for EPA testimony, *see* Bradshaw II Letter to EPA 5-6 (Dkt No. 57-11), remain unresolved following the publication of the OIG Report. Instead, Hanor complains that the OIG Report should not count because EPA was only the *subject*, and not the *author*, of the report. *See* Hanor Resp. to Show Cause Order 3-5 (Dkt. No. 71). This is a red herring. A Rule 56(d) motion turns on the necessity of discovering essential unknown facts, not whether undisputed facts come from a preferred agency messenger. *See Harned v. United States*, No. 13-CT-3068, 2016 U.S. Dist. LEXIS 36296, *17-18 (E.D.N.C.

---

[3] *See also Moon v. United States*, No. 95-1797, 1996 U.S. App. LEXIS 14955, *9 (4th Cir. Jun. 21, 1996) ("When considering whether a district court properly decided to relax or modify its local rules and procedural orders, we give the district court broad leeway"); *Silicon Knights, Inc. v. Epic Games, Inc.*, 917 F. Supp. 2d 503, 510 (E.D.N.C. 2012) ("District courts have broad discretion to interpret their local rules and only in rare cases will appellate courts question the exercise of discretion in connection with the application of local rules") (quotation omitted).

2

Mar. 21, 2016) (Rule 56(d) relief may occur "if the nonmoving party requires discovery to *identify facts* essential to justify the party's opposition") (emphasis added and quotation omitted); *see also Regions Bank v. Gator Equip. Rentals, LLC*, Civ. No. 15-5084, 2016 U.S. Dist. LEXIS 112938, *19-20 (E.D. La. Jul. 1, 2016) (denying 56(d) motion because it gives "nothing more than a speculative hope that inquiry into [the agency's] decision-making process might provide [] a claim or defense to [the] motion for summary judgment").

Moreover, the OIG Report: (1) was written by an office *within EPA* specifically created to "conduct, supervise, and coordinate audits relating to the programs and operations of [EPA]," 5 U.S.C. app. 3 § 4(a); (2) arose from extensive document review and interviews with EPA staff and managers, other agency officials, and stakeholders conducted "from April 2016 through May 2017," OIG Report at 8-9 (Dkt. No. 69-2); and (3) includes responses from other EPA offices generally agreeing to the findings and recommendations and submitting memoranda that form part of the report, *id.* at 27-33. Hanor asserts that the OIG Report is unworthy of the Court's consideration because OIG *might* not have changed any minor discrepancies that EPA identified in its review of the draft report, *see* Hanor Resp. to Show Cause Order 4-5 (Dkt. No. 71), even though EPA expressed overall agreement with the draft, and even though OIG made clear it "incorporated [EPA's comments] into our final report as appropriate." OIG Report 24, 29, 31 (Dkt. No. 69-2). However, the credibility of the OIG Report, and clear indications that the report arose from the collection and analysis of official positions and other information from across the entire agency, belie Hanor's speculation that it might find a point of dissent in someone at EPA. Even if there was minor dissent over a discrepancy (should one exist), that would not change the OIG Report's central finding that EPA has not diligently pursued compliance by finalizing the EEMs and requiring reporting. *See Huggins v. Roach*, No. 5:15-CT-3002, 2016 U.S. Dist.

LEXIS 127382, *13 (E.D.N.C. Aug. 1, 2016) (moving party in 56(d) motion must "demonstrate that the information sought would be sufficient to create a genuine issue of material fact such that it would have defeated summary judgment") (quotation omitted).[4]

Hanor's motion for Rule 56(d) relief relied on its letter to EPA requesting testimony. *See* Bradshaw II Letter to EPA 5-6 (Dkt No. 57-11). But in its response to the Show Cause Order, Hanor likely did not discuss the details of the letter requesting EPA testimony because doing so would highlight why Hanor's Rule 56(d) motion is moot. As shown below, the OIG Report conclusively answers the only factual questions in Hanor's testimony request to the agency that were arguably relevant to Plaintiffs' summary judgment motion.

First, in its testimony request, Hanor asked EPA whether the Air Compliance Agreement "remains in effect." *Id*. at 5. The OIG Report and EPA's responses answer this question affirmatively. *See* OIG Report 28 (Dkt. No. 69-2) (EPA Office of Air and Radiation response: "The EPA remains committed to fulfilling this goal of developing EEMs for AFOs based on scientifically and statistically sound methods."); *id*. at 31 (similar statement from EPA Office of Enforcement and Compliance Assurance).

Second, Hanor asked whether EPA "has ever deviated from its position that it does not require EPCRA reporting from farms participating in, and in compliance with, the Air Compliance Agreement." Bradshaw II Letter to EPA at 5 (Dkt No. 57-11). The OIG Report

---

[4] Even if the Court only considered the Hanor-approved appendices of the OIG Report, those pages alone would moot Hanor's 56(d) motion. The appendices describe each EPA office's new timelines created in response to the OIG Report. OIG Report at 28-33 (Dkt. No. 69-2). The timelines show that EPA had not been following, and still does not have, a "detailed schedule of compliance." June 17, 2016 Order 11, 13 (Dkt. No. 33); *see also* Argument Section 3.b, *infra* at 10-12; Pls.' Reply 7-10 (Dkt. No. 60).

4

conclusively resolves that, for EPA, the "civil enforcement protections for Agreement participants remained in effect." OIG Report at 10 (Dkt. No. 69-2); *see also id.* at 16, 17.

Third, Hanor's letter to EPA asked about "the current estimated timeframe for completion" for the EPA's Air Compliance Agreement activities. Bradshaw II Letter to EPA at 5 (Dkt No. 57-11); *see also* Mem. in Support of Def.'s Mot. Partial Summ. J. & Rule 56(d) Relief and Objection to Pls.' Mot. Partial Summ. J. 26-27 ("Hanor Opp.") (Dkt. No. 56) (describing the request for testimony on "EPA's efforts in finalizing the EEMs"). The OIG Report and EPA's responses provide a detailed answer. "According to EPA managers, the agency in recent years did not have staff with combined expertise in agricultural emissions, air quality and statistical analysis," which calls into question the value of the NAEMS data and, since 2013, required EPA to "put[] the EEM effort largely on hold." OIG Report at 16 (Dkt. No. 69-2). OIG and the other EPA offices then agreed to a timeline that does not actually provide timeframes for completing either NAEMS or the EEMs—it simply lays out a schedule for EPA to continue developing a schedule. *Id.* at 27-32 (agreeing, at most, to try to "develop a schedule for completion of the EEMs *after* completion of data review and [quality assurance] development") (emphasis added).

Plaintiffs' previous briefing shows how the remaining questions in Hanor's letter request to EPA are insufficient for Rule 56(d) relief. *See* Bradshaw II Letter to EPA at 5-6 (Dkt No. 57-11). Hanor's request for an EPA interpretation of whether the Air Compliance Agreement is a form of "diligently pursuing an administrative order," *id.* at 5, is irrelevant, because Hanor has never argued that the Air Compliance Agreement is ambiguous—and "unambiguous contracts are to be construed without resort to extrinsic evidence." Mem. in Opp'n to Hanor's Mot. for Fed. R. Civ. Pro. 56(d) Relief 6-7 ("Pls.' Opp. to 56(d) Mot.") (Dkt. No. 61) (quoting *Monsanto Co. v. ARE-108 Alexander Rd., LLC*, 632 Fed. Appx. 733, 739 (4th Cir. 2015)). Moreover, EPA

5

would not state that the Air Compliance Agreement had "preclusive effect" on citizen suits in the agency proceeding that finalized the agreement. *Id*. at 11 (quoting Environmental Appeals Board proceeding). Thus, any inconsistent agency position now would be a post-facto revision.

In addition, the testimony request letter's questions about Hanor's adherence to the Air Compliance Agreement—which essentially ask EPA to double-check whether Hanor paid a nominal "penalty" in 2006, *see* Air Compliance Agreement ¶¶ 25, 42 (Dkt. No. 15-1)—have nothing to do with Plaintiffs' pending summary judgment motion. There is no dispute whether Hanor paid a nominal fee eleven years ago, and whether it did so is not a "fact[] essential to justify the party's opposition" to a motion turning on, *inter alia*, whether EPA's activities under the Air Compliance Agreement are diligent. *See* Pls.' Opp. to 56(d) Mot. 9-10 (Dkt. No. 61) (quoting *Harned*, 2016 U.S. Dist. LEXIS 36296 at *17-18).

Finally, Hanor's generalized statement that "additional discovery [] may be necessary," Hanor Opp. 27 (Dkt. No. 56), is a fishing expedition into EPA's decision-making process that is "nothing more than a speculative hope." *Regions Bank*, 2016 U.S. Dist. LEXIS 112938 at *19-20. The Court's order on Hanor's motion to dismiss explains that Hanor must demonstrate that EPA had in place a detailed "schedule of compliance" to prove diligent prosecution. *See* Jun. 17, 2016 Order at 13 (Dkt. No. 33). Hanor cannot seriously contend that even though EPA's response to OIG's recommendations was to commit to attempt to create a schedule sometime in the future, the testimony that Hanor seeks from EPA will uncover an existing but currently hidden detailed schedule of compliance that EPA and Hanor are actually following.

In sum, Hanor's attacks on the quality of the OIG Report are unavailing, and because the report "bears directly and comprehensively" on the only factual questions in Hanor's request for

EPA testimony that were arguably relevant to Plaintiffs' summary judgment motion, Hanor's motion for Rule 56(d) relief is moot.[5]

3. **The OIG Report Reinforces Plaintiffs' Summary Judgment Arguments that EPA's Air Compliance Agreement is Not Diligent Pursuit.**

The OIG Report and other EPA offices' concurring memoranda, *see* OIG Report at 28-33 (Dkt. No. 69-2), conclusively show that Hanor cannot prove the Air Compliance Agreement is diligent prosecution.[6] The OIG Report findings make clear that the Air Compliance Agreement is not an action that "enforces" the Emergency Planning and Community Right-to-know Act ("EPCRA"). Even if one could construe the Air Compliance Agreement as enforcement, the OIG Report shows that EPA is not executing the Agreement in a "diligent" fashion.

   a. **The OIG Report shows that the Air Compliance Agreement has no "enforceable compliance aspects."**

Agency action that does not "command compliance" but instead subjects facilities to "general, preexisting obligation[s] to comply with applicable" laws cannot form the basis of a diligent prosecution defense. Pls.' Mot. Summ. J. Mem. 16-20 (Dkt. No. 51); *see also* Pls.' Reply 2-4 (Dkt. No. 60). A federal district court recently surveyed authority on diligent prosecution and

---

[5] Hanor's statement that denying its 56(d) motion would "work a prejudicial harm" because it would "require Hanor to defend itself with nothing more than the OIG Report" is both misplaced and wrong. Hanor Resp. to Show Cause Order 5 (Dkt. No. 71). The OIG Report answered the relevant questions Hanor raised in its Rule 56(d) motion; Hanor's dissatisfaction with those answers does not make the report "prejudicial." *See id.* Moreover, Hanor has submitted to the Court several EPA documents and other records in support of its opposition to Plaintiffs' summary judgment motion. *See, e.g.*, Hanor's Appx. to Statement of Material Facts (Dkt. No. 57-1). Hanor is not alone with nothing more than the OIG Report.

[6] Recent authority from another federal district court reiterates Plaintiffs' undisputed point that Hanor has the burden to prove diligent prosecution. *See Tenn. Clean Water Network v. TVA*, No. 3:15-cv-00424, 2017 U.S. Dist. LEXIS 135312, *143 (M.D. Tenn. Aug. 4, 2017) ("TVA . . . presented no evidence to suggest that the surviving federal claims . . . were being prosecuted by the State at all, let alone diligently. The Court will not simply assume that claims are barred absent any evidence to the contrary."); *see also* Pls.' Mot. Summ. J. Mem. 9 (Dkt. No. 51); Pls.' Reply 1 (Dkt. No. 60).

7

found that the affirmative defense is available when, among other elements, a "consent decree imposes concrete deadlines" that "have bite" through "financial penalties for noncompliance," and when the consent decree "holds the [defendant] accountable" by requiring ongoing monitoring and reporting. *Pitroff v. United States*, No. 16-cv-522, 2017 U.S. Dist. LEXIS 133761, *13-14 (D.N.H. Aug. 22, 2017) (citing, *inter alia*, *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carrol Cty.*, 523 F.3d 453, 461 (4th Cir. 2008)).

Unable to break free from this precedent, Hanor is stuck reimagining the Air Compliance Agreement as creating a "bookend" of EPCRA enforcement around the Complaint. Hanor Resp. to Show Cause Order 6-7 (Dkt. No. 71); *see also* Hanor Opp. 16-17 (Dkt. No. 56) ("requir[ing] compliance with EPCRA's reporting requirements, even if based on a prospective schedule").

The OIG Report rejects Hanor's construction of the Air Compliance Agreement, and instead accurately describes the agreement as an open-ended *exemption* from enforcement.[7] Several times throughout its report, OIG refers to the Air Compliance Agreement as providing "enforcement protections" for participating CAFOs. *See, e.g.*, OIG Report at "At a Glance" (Dkt. No. 69-2) ("As a result, the applicability of requirements to control emissions from individual animal feeding operations remained undetermined, enforcement protections for consent agreement participants remained in effect longer than anticipated. . ."); *id.* at 6, 10, 16, 18 (same); *id.* at 17 ("EPA had not yet determined that it could not develop any of the EEMs, and thus has not waived enforcement protections for any of the emissions sources covered under the 2005 Agreement"). Thus, the Air Compliance Agreement is not enforcement, but rather

---

[7] Had EPA disagreed with this characterization, it would have mentioned its disagreement, as the characterization is central to the OIG Report and appears several times. But EPA had no quarrel with its OIG describing the Air Compliance Agreement as providing "enforcement protections." OIG Report at 28-33 (Dkt. No. 69-2). EPA is the dog that didn't bark.

8

protection from enforcement. *See also* Pls.' Reply 3 (Dkt. No. 60) (describing the ACA "as a 'safe harbor' for industry (*i.e.*, an exemption, rather than an enforcement action)").[8]

### b. The OIG Report shows that EPA is not acting "diligently."

The OIG Report's description of EPA's dilatory execution of the Air Compliance Agreement provides further authority for what Plaintiffs have shown in this motion briefing—EPA is not pursuing Hanor's violations with diligence. *See* Pls.' Mot. Summ. J. Mem. 21-24 (Dkt. No. 51) (explaining that the Air Compliance Agreement "does not set out a 'detailed schedule of compliance' for Hanor," citing the June 17, 2016 Order (Dkt. No. 33)); Pls.' Reply 7-10 (Dkt. No. 60) (explaining how EPA's activities are like other "agency timetables spanning a decade [that are] 'simply too long'").

Throughout its report, OIG states that EPA is "years behind schedule" on finalizing the EEMs, and on removing the release and covenant not to sue. OIG Report 10 (Dkt. No. 69-2).

EPA identified a timeline for completing its obligations under the Air Compliance Agreement in a 2005 Federal Register notice. *Id.* at 2, 10 (citing 70 Fed. Reg. 4958-4977 (Jan. 31, 2005)). According to the OIG Report,

> Based on the original expectations for completion of the tasks in the [Federal Register] Notice, the NAEMS monitoring would have been completed in 2007, and the EPA would have begun publishing EEMs in 2009. By 2010 all facilities would have done the following: 1. Applied the EEMs to determine whether they met or exceeded . . . CERCLA/EPCRA release reporting thresholds . . . 2. Submitted any required . . . CERCLA/EPCRA release notifications. 3. Implemented [any] requirements described in their permits. *At this point, the protections from civil enforcement actions under the Agreement would have ended for participating AFOs.*

---

[8] Moreover, the Air Compliance Agreement provides no "bite" that "hold[s Hanor] accountable" for any noncompliance with the consent order. *Pitroff*, 2017 U.S. Dist. LEXIS 133761 at *13-14. As Plaintiffs explained in prior briefing, all that EPA could do if Hanor declined to follow the Air Compliance Agreement is bring a true enforcement action against the facility under the "general, preexisting" obligations of EPCRA, and that action could not even reach as far as Plaintiffs' Complaint. *See* Pls.' Reply 3-4 & n.4 (Dkt. No. 60).

9

*Id.* at 10 (emphasis added);[9] *see also id.* at 5 Fig. 1 (visually demonstrating "Expected timeframes for monitoring study and EEM development").

Contrary to the timeline it expressed in 2005, EPA has drafted only a handful of the 32 EEMs, and has not finalized any of those drafts. *Compare id.* at 12 Fig. 4 (visually demonstrating "Expected and actual NAEMS/EEM development timeline"); *id.* at "At a Glance" ("Delays in developing the [EEMs] stemmed from limitations with NAEMS data, uncertainty about how to address significant feedback from the EPA's Science Advisory Board, and a lack of EPA agricultural air expertise and committed resources. *The EPA had not finalized its work plan or established timeframes to finish the methodologies.*" (emphasis added)). Thus, according to the OIG Report, "Eleven years after the Agreement was entered, and 7 years after NAEMS monitoring was completed, the EPA, state, local and tribal permitting authorities, and AFO owners/operators, did not have scientifically defensible EEMs needed to make CAA and EPCRA/CERCLA compliance determinations." *Id.* at 16. Hanor does not contest this delay, and again must resort to Orwellian language, describing the now obsolete "schedule for compliance" as one that is "to some extent fluid." Hanor Resp. to Show Cause Order 10 (Dkt. No. 71). Hanor cites no cases in which a court equates a "fluid schedule" to the required detailed schedule of compliance with real bite for missed deadlines. Jun. 17, 2016 Order at 13 (Dkt. No. 33); *Pitroff*, 2017 U.S. Dist. LEXIS 133761 at *13-14.

---

[9] It is hard to take seriously Hanor's characterization of this timetable—a timetable that gave participating facilities a five-year exemption from compliance with environmental laws while EPA would develop methodologies for estimating emissions—as "a dizzying schedule." Hanor Resp. to Show Cause Order 7 (Dkt. No. 71). In any event, as described *infra*, that five-year exemption has stretched nearly eight more years, with no end in sight.

As the OIG Report notes, the overarching delay is the result of several agency problems. For example, after EPA received from the Science Advisory Board ("SAB") a damning response to the draft EEMs in 2013, "competing priorities resulted in the EPA's Office of Air and Radiation putting the EEM effort largely on hold. The EPA had dedicated few agency resources to develop EEMs since the SAB's 2013 final report. The few remaining agency staff who worked on the NAEMS and subsequent data analysis were reassigned to other work, and the EPA stopped funding the contract for NAEMS analysis." OIG Report 16 (Dkt. No. 69-2).[10]

Despite the pressure of an OIG investigation and subsequent report, EPA still has not set concrete deadlines for when Hanor and other Air Compliance Agreement participants must follow their "preexisting obligations" to comply with EPCRA. The most EPA can muster is that it will evaluate the NAEMS data for their quality by the end of March 2018, *see id.* at 29 (EPA Office of Air and Radiation response), and assess by the end of June 2018 whether EPA should even try to complete certain EEMs, *see id.* at 29-30 (same). Nowhere does EPA state that it will complete any EEMs, much less actually enforce EPCRA, by a date certain. *See generally id.* at 28-32. In fact, the only non-interim date certain that EPA identifies is for when the agency would announce it is *giving up* on trying to develop EEMs. *Id.* at 27; *see* Hanor Resp. to Show Cause Order 11 (Dkt. No. 71).

Even if EPA had created a detailed, concrete new EEMs timeline in response to the OIG Report, such a post-Complaint promise would not be a proper predicate for diligent prosecution. *See* Pls.' Mot. Summ. J. Mem. 22-23 n.16 (Dkt. No. 51) (citing cases for point that there is no

---

[10] Moreover, the agency did not use systematic planning for applying NAEMS data to develop and complete the EEMs. OIG Report 22 (Dkt. No. 69-2). This threatens to prolong EPA's long-delayed finalization of the EEMs: "Without adequate systematic planning, the EPA is at risk of spending additional time and resources to develop EEMs that are still not sufficient for estimating AFO emissions nationwide." *Id.* at 22-23.

11

diligent prosecution when agency has no detailed schedule of compliance *at time of filing of Complaint*). The OIG Report confirms that there was no detailed schedule of compliance when Plaintiffs filed the Complaint in 2015.

In sum, the earliest that EPA even envisions it might *start* to draft a comprehensive schedule regarding the Air Compliance Agreement is the end of June 2018. OIG Report 27 (Dkt. No. 69-2). But the agency also states that it may decide not to develop EEMs at that time. At that point, it *may or may not* have sufficient information about the quality of the NAEMS data and agency staff resources to offer a general plan to create a schedule for developing EEMs. *See id*. at 29-30 (EPA Office of Air and Radiation Response). Thus, there has been zero compliance with the law, and it is not clear that the agency will compel some form of compliance in the future. Moreover, such EEMs, *if* EPA will develop them, will likely take several additional years. *Id.* at 13-14 (describing SAB recommendations); *see also Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1038 (D.C. Cir. 2007) (Rogers, J., dissenting) ("Assuming no glitches, EPA's endeavor to develop reliable methodologies could, according to the recommendations it has followed, take five, twenty, or even thirty, years") (uncontested by majority opinion). The process is already at a point where now—in late November 2017—EPA is nearly eight years behind on a schedule that the agency devised over a decade ago. *See id*. at 10, 16, Figures 1 & 4. Delay for more than a decade, with no end in sight, falls far short of diligent prosecution. *See* Pls.' Mot. Summ. J. Mem. 10 n.8, 19, 21-24 (Dkt. No. 51); Pls.' Reply 7-10 & n.9 (Dkt. No. 60); *see also Pitroff*, 2017 U.S. Dist. LEXIS 133761 at *12-13 (collecting cases, including from Fourth Circuit district courts, where agency actions that even "lie[s] dormant for over a year" are "laggardly movement that amounts to non-diligent prosecution").

## CONCLUSION

For the foregoing reasons, the Court should deny Hanor's motion for Rule 56(d) relief as moot, and grant partial summary judgment on the issue of Hanor's diligent pursuit defense, in favor of Plaintiffs.

Respectfully submitted,

Dated: November 22, 2017
/s/ *James L. Conner, II*
James L. Conner, II (NC Bar No. 12365)
Calhoun, Bhella & Sechrest, LLP
4819 Emperor Blvd., Suite 400
Durham, NC 27703
(919) 887-2607 (telephone)
(919) 827-8806 (fax)
jconner@cbsattorneys.com
Local Civil Rule 83.1 Counsel

Peter Brandt, *special appearance*
	(DC Bar No. 982936)
Daniel H. Lutz, *special appearance*
	(WA Bar No. 45708)
The Humane Society of the United States
1255 23rd Street NW
Washington, DC 20037
(202) 676-2386 (telephone)
(202) 676-2357 (fax)
pbrandt@humanesociety.org
dlutz@humanesociety.org

*Counsel for Plaintiffs The Humane Society of the United States and Sound Rivers, Inc.*

13

**CERTIFICATE OF SERVICE**

I, James L. Conner, II, certify as follows:

That on this day, I served copies of the foregoing via the Court's Case Management / Electronic Case Filing system on the following:

| | |
|---|---|
| Jean Paul Bradshaw II | Robert J. Lambrechts |
| Grant A. Harse | Lathrop & Gage LLP |
| Lathrop & Gage LLP | Building 82, Suite 1000 |
| 2345 Grand Boulevard, Suite 2200 | 10851 Mastin Boulevard |
| Kansas City, MO 64108 | Overland Park, KS 66210 |
| (816) 292-2000 (telephone) | (913) 451-5100 (telephone) |
| (816) 292-2001 (fax) | (913) 451-0875 (fax) |
| | |
| Henry L. Kitchin, Jr. | Eugene E. Matthews, III |
| McGuire Woods LLP | McGuire Woods LLP |
| 300 North Third Street, Suite 320 | Gateway Plaza |
| P.O. Box 599 (28402) | 800 East Canal Street |
| Wilmington, NC 28401 | Richmond, VA 23219 |
| (910) 254-3800 (telephone) | (804) 775-1000 (telephone) |
| (910) 254-3900 (fax) | |

*Counsel for Defendant The Hanor Company of Wisconsin, LLC*

I certify under penalty of perjury that the foregoing is true and correct.

Dated: November 22, 2017        /s/    James L. Conner, II

James L. Conner, II
*Counsel for Plaintiffs The Humane Society of the United States and Sound Rivers, Inc.*