IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:15-CV-109-FL

| | | |
|---|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES and SOUND RIVERS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | ORDER |
| v. | ) ) | |
| THE HANOR COMPANY OF WISCONSIN, LLC, | ) ) ) | |
| Defendant. | ) ) | |

This matter is before the court on plaintiffs' motion for partial summary judgment (DE 50), and defendant's motion for partial summary judgment and for relief under Federal Rule of Civil Procedure 56(d) (DE 55). The issues raised have been briefed extensively, including through supplemental briefing in response to the court's November 3, 2017, order. For the following reasons, the court denies plaintiffs' motion, denies as moot defendant's motion for relief under Rule 56(d), and grants in part and denies in part defendant's motion for partial summary judgment.

## STATEMENT OF THE CASE

Plaintiffs commenced this action on August 1, 2015, pursuant to a citizen suit provision of the Emergency Planning and Community Right-to-Know Act of 1985 ("EPCRA"), 42 U.S.C. § 11046(a)(1), asserting violations of EPCRA by defendant at its concentrated animal feeding operation, known as Shellbank, located outside of Rocky Mount, North Carolina. Plaintiffs assert a claim under EPCRA based upon defendant's failure to comply with emergency release notification

requirements of EPCRA for past and ongoing releases of ammonia into the environment. Plaintiffs seek declaratory and injunctive relief, as well as attorneys' fees and costs, particularly as follows:

1. Declare that Hanor has violated and remains in violation of the emergency release notification requirements of EPCRA, as alleged herein.

2. Declare that Hanor's violation of the emergency release notification requirements of EPCRA have injured Plaintiffs' and their members' interests, as alleged herein.

3. Order Hanor to operate its Shellbank facility in accordance with the emergency release notification requirements of EPCRA.

4. Order Hanor to immediately notify the Edgecombe County Office of Emergency Services . . . and the North Carolina Department of Public Safety . . . of the releases of reportable quantities of ammonia from Shellbank.

5. Order Hanor to file legally adequate written follow-up notifications with the Edgecombe County Office of Emergency Services and the North Carolina Department of Public Safety concerning the release of reportable quantities of ammonia from Shellbank.

6. Order Hanor to pay appropriate civil penalties of up to $37,500 per day for each day that Hanor failed to abide by the EPCRA emergency release notification provisions.

7. Order Hanor to pay Plaintiffs' reasonable attorneys' fees, expert witness fees, and costs incurred in prosecuting this action, pursuant to 42 U.S.C. § 11046(f).

(Compl. at 27).

Defendant moved to dismiss on September 21, 2015, on the basis that the action "is plainly barred by the terms of 42 U.S.C. § 11046(e) . . . mandat[ing] that no EPCRA citizen suit 'may be commenced' if the U.S. Environmental Protection Agency ("EPA") 'has commenced and is diligently pursuing an administrative order or civil action to enforce the requirement concerned . . . .'" (M. to Dismiss (DE 15) at 1). Plaintiffs subsequently moved to strike exhibits offered in support

of the motion to dismiss. On June 17, 2016, the court denied the motion to dismiss and granted the motion to strike exhibits. See Humane Soc'y of the United States v. Hanor Co. of Wisconsin, LLC, No. 4:15-CV-109-FL, 2016 WL 3435192 (E.D.N.C. June 17, 2016) ("Hanor I").

Defendant answered the complaint on July 1, 2016, asserting as a third affirmative defense that plaintiffs are "barred from bringing this action pursuant to 42 U.S.C. § 11046(e), by virtue of the Shellbank Agreement, an administrative order entered into by Defendant and EPA." (Answer (DE 35) at 14). The court entered case management order on August 1, 2016, setting a deadline for discovery of December 15, 2017, and a dispositive motions deadline of February 3, 2018.

On February 27, 2017, plaintiffs filed the instant motion seeking partial summary judgment in their favor "on the issue of defendant['s] . . . diligent prosecution affirmative defense," referencing defendant's third affirmative defense asserted in answer. (M. for Sum. J. (DE 50) at 1). In support of the motion, plaintiffs filed a proposed order, a memorandum of law, and a statement of material facts accompanied by an affidavit by counsel for plaintiffs attaching documents upon which it relies in support of the motion, including: 1) excerpts of defendant's initial disclosures; 2) EPA Notice on Animal Feeding Operations Consent Agreement and Final Order, 70 Fed. Reg. 4958 (Jan. 31, 2005) (hereinafter the "January 31, 2005, Notice"); 3) Association of Irritated Residents v. EPA, 494 F.3d 1027 (D.C. Cir. 2007), 4) EPA, Call for Information Related to the Development of Emissions- Estimating Methodologies for Animal Feeding Operations, 76 Fed. Reg. 3060 (Jan. 19, 2011) (hereinafter, the "January 19, 2011, Call for Information"); 5) Excerpts of EPA Final Rule, Fine Particulate Matter National Ambient Air Quality Standards, 81 Fed. Reg. 58010 (Aug. 24, 2016) (hereinafter, the "August 26, 2016, EPA Final Rule"); 6) EPA Notice on Animal Feeding Operations Consent Agreement and Final Order, 70 Fed. Reg. 40016 (July 12, 2005) (hereinafter,

the "July 12, 2005, Notice"); 7) Apr. 19, 2013 Letter from David Allen, EPA Science Advisory Board Chair, to Bob Perciasepe, EPA Acting Administrator attaching Science Advisory Board Report; 8) Excerpts of National Academy of Sciences, Ad Hoc Committee on Air Emissions from Animal Feeding Operations et al., National Research Council, Report (2003) (hereinafter the "2003 National Academy of Sciences Report"); 9) Final Rule, Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste, 73 Fed. Reg. 76948 (Dec. 18, 2008) (hereinafter the "2008 Exemption Rule"); 10) documents from the case Waterkeeper Alliance v. EPA, No. 09-1017 (D.C. Cir.); and 11) excerpts of a consent decree from a case in the Middle District of Louisiana.

On April 7, 2017, defendant responded in opposition to plaintiffs' motion, which filing was accompanied by a motion for partial summary judgment and for relief under Federal Rule of Civil Procedure 56(d).  In its motion for partial summary judgment, defendant seeks dismissal of part of plaintiffs' claims that are "seeking relief that exceed the authority granted by section 326(a) of EPCRA, 42 U.S.C. § 11046(a)."  (Def's M. for Sum. J (DE 55) at 1; see id. at 2).  Defendant seeks, in part, an order "on the issue of Plaintiffs' claims related to section 304(a) and (b) of EPCRA" and dismissal of the "claim for relief contained at paragraph 4 on page 27 of the Complaint."  (Id. Prop. Order (DE 55-1)).

In opposition to plaintiffs' motion for summary judgment, and in support of its motion for relief under Rule 56(d), defendant relies on the January 31, 2005, Notice and a July 27, 2005, consent agreement and final order between Hanor and the EPA (hereinafter the "Shellbank Agreement"), attached to its earlier motion to dismiss.  Defendant also relies upon additional documents accompanying its memorandum of law and statement of material facts, including: 1)

additional excerpts of the 2003 National Academy of Sciences Report; 2) Claudia Copeland, Congressional Research Service Report, Air Quality Issues and Animal Agriculture: EPAs Air Compliance Agreement (Aug. 18, 2014) (hereinafter, "August 18, 2014, Congressional Research Service Report"); 3) Affidavit of David R. Wade, Vice President of Operations for defendant; 4) an EPA summary of the 2008 Exemption Rule; 5) an EPA news release regarding availability of "Emissions Data from Animal Feeding Operations Study" (Jan. 13, 2011); 6) a draft of an EPA report "Development of Emissions Estimating Methodologies for Lagoons and Basins at Swine and Dairy Animal Feeding Operations," dated February 2012; 7) an EPA memorandum from Stephen D. Page, Director, Office of Air Quality Planning and Standards, U.S. EPA, to Ed Hanlon, Designated Federal Officer, Animal Feeding Operations Emissions Review Panel, EPA Science Advisory Board Staff Office (Feb. 17, 2012); 8) July 13, 2013 letter from Bob Perciasepe, Acting Administrator, EPA, to David T. Allen, Ph.D, Chairman, Science Advisory Board, 9) Aug. 20, 2015, letter from Robert Bookman, Chief of Chemical Management and Emergency Planning Section, EPA, Region 4, to Greg Sconyers, operations manager, Hanor; and 10) affidavit of counsel for defendant.

In defendant's motion for Rule 56(d) relief, defendant seeks to conduct further discovery that it contends it needs to defend against plaintiffs' motion. In opposition to defendant's request for Rule 56(d) relief, plaintiffs rely upon 1) a July 10, 2012, Notice of Intent to Sue Letter, from plaintiff Humane Society of the United States to defendant; 2) a September 6, 2012, Response to Notice of Intent to Sue Letter; 3) excerpts of plaintiff Humane Society of the United States initial disclosures; 4) EPA FOIA Annual Report for October 1, 2015 to September 30, 2016; and 5) excerpts of

transcript of December 13, 2005 oral argument before the U.S. Environmental Appeals Board, In the Matter of Consent Agreements and Proposed Final Orders for Animal Feeding Operations.

On June 30, 2017, the parties jointly moved to stay discovery, requesting that the court stay further discovery and suspend the running of deadlines contained within the case management order, until the court enters an order on the pending motions. The parties proposed to file a new case management plan within two weeks of the court's order on the pending motions. The court granted the joint motion to stay on the same date.

On September 29, 2017, plaintiffs filed a notice of suggestion of subsequently decided controlling authority, relying upon a September 17, 2017, EPA Office of Inspector General report titled "Eleven Years After Agreement, EPA Has Not Developed Reliable Emission Estimation Methods to Determine Whether Animal Feeding Operations Comply With Clean Air Act and Other Statutes" (hereinafter, the "2017 EPA Office of Inspector General Report"). On November 3, 2017, the court directed defendant to show cause why its motion for relief under Rule 56(d) should not now be denied as moot in light of the information in subsequently decided authority. Defendant filed a response to the show cause order on November 17, 2017, and plaintiffs filed a reply thereto on November 22, 2017.

## STATEMENT OF UNDISPUTED FACTS

The 2003 National Academy of Sciences Report includes the following statements:

1.   "[EPA] has been considering what information is needed to define and support feasible regulation of air emissions from AFOs [animal feeding operations]." (2003 National Academy of Sciences Report (DE 57-2) at 4).[1]

---

[1] Page numbers provided in citations to documents in the record in this order specify the page number of the document filed on the docket in the court's electronic case filing (ECF) system, rather than the page number, if any, specified on the face of the document.

6

2. "Available estimates of emission factors, rates, and concentrations are sufficiently uncertain that they provide a poor basis for regulating or managing air emissions from [animal feeding operations]." (Id. at 5).

3. "USDA and EPA should initiate and conduct a coordinated research program designed to produce a scientifically sound basis for measuring and estimating air emissions from [animal feeding operations] on local, regional, and national scales." (Id. at 7).

4. "Directly measuring emissions from every [animal feeding operation] poses both serious technical problems and prohibitive costs. Thus there is a need for an approach that can be used by state and federal agencies to estimate emissions from individual [animal feeding operations]." (Id. at 10).

5. "[E]mission rates from agricultural operations (including [animal feeding operations]) are highly variable within a 24-hour period and over the course of a year." (Id. at 11).

6. "Emission rates for some nonagricultural sources (e.g., chemical or power plants) tend to be more regular in any 24-hour period and less dependent on season and weather than those for [animal feeding operations]." (Id.).

7. "[A] process-based modeling approach [should] be used as a replacement for the emission factor approach to limit and/or regulate for most [animal feeding operation] emissions." (Id. at 12).

8. "Better estimates are needed of the rates . . . of ammonia volitization from animal housing, manure storage, and cropland . . . . The importance of factors (e.g., temperature, pH) that affect these rates must be determined to improve mathematical models." (2003 National Academy of Sciences Report (DE 53-9) at 8).

On January 31, 2005, EPA issued a notice in the Federal Register regarding a voluntary consent agreement and final order, which is referenced in the notice and hereinafter as the "Air Compliance Agreement." (See Jan. 31, 2005, Notice, 70 Fed. Reg. 4958 (DE 53-3) at 3). The January 31, 2005, Notice provides a summary description and supplementary information about the Air Compliance Agreement, as well as the full text thereof with appendices. The January 31, 2005, Notice includes the following statements:

1.     "The EPA is offering animal feeding operations [] an opportunity to sign a voluntary consent agreement and final order (henceforth referred to as the 'Air Compliance Agreement' or the 'Agreement'). . . . [animal feeding operation] that choose to sign the Air Compliance Agreement will share responsibility for funding an extensive, nationwide emissions monitoring study. The monitoring study will lead to the development of methodologies for estimating emissions from [animal feeding operations] and will help [animal feeding operations] to determine and comply with their regulatory responsibilities under . . . EPCRA. Once applicable emission estimating methodologies have been published by EPA, the Agreement will also require each participating [animal feeding operation] to certify that it is in compliance with all relevant requirements of . . . EPCRA." (Id.).

2.     "EPA's publication of the emissions estimating methodologies will trigger the obligation of participating [animal feeding operations] to determine their emissions . . . and to make any requisite hazardous release notices under . . . EPCRA." (Id. at 4).

3.     "By offering [animal feeding operations] this opportunity to sign an Air Compliance Agreement, the Agency will help participating [animal feeding operations] pool their resources to lower the cost of measuring emissions and ensure that they comply with all applicable environmental regulations in the shortest amount of time. While EPA has the authority on a case-by-case basis to require [animal feeding operations] to monitor their emissions and to come into compliance with applicable Federal laws, that process has proven to be difficult and time consuming, partly due to the uncertainty regarding emissions from [animal feeding operations], which was reiterated in [the 2003 National Academy of Sciences Report] . . . . Consequently, EPA believes that the Air Compliance Agreement will be the quickest and most effective way to address the current uncertainty regarding emissions from [animal feeding operations] and to bring all participating [animal feeding operations] into compliance with all applicable regulatory requirements." (Id. at 3).

4.     "[Animal feeding operations] that choose to participate in the Air Compliance Agreement and meet all its conditions will receive from EPA a limited release and covenant not to sue from liability for certain past and on-going . . . EPCRA violations. The release and covenant not to sue will cover an [animal feeding operation's] liability for failing to comply with certain provisions of . . . EPCRA, . . . up to the time the [animal feeding operation] reports its releases under . . . EPCRA . . . ." (Id. at 4).

5.     "The purpose of the monitoring study is to: collect data and aggregate it with appropriate existing emissions data; analyze the monitoring results; and

create tools (e.g., tables and/or emission models) that [animal feeding operations] could use to determine whether they emit pollutants at levels that require them to . . . submit notifications under . . . EPCRA. . . . [A]s with any large and complex effort, this work must be conducted over a period of years. . . . EPA expects that the monitoring will begin in 2005 and continue for 2 years. Two years of monitoring is the minimum time needed . . . . Within 18 months after the conclusion of the nationwide emissions monitoring study, EPA expects that it will publish on its Web site, on a rolling basis as work is completed, the methodologies for estimating emissions . . . . (Id. at 5).

Consistent with the statements in the January 31, 2005, Notice, the Air Compliance Agreement published therein includes the following provisions:

1.      "The purpose of this Agreement is to ensure that [Participating Company] complies with . . . applicable release notification provisions of . . . EPCRA. To that end, this Agreement requires [Participating Company], among other things, to be responsible for the payment of funds towards a two-year national air emissions monitoring study that will lead to the development of Emissions-Estimating Methodologies that will help animal feeding operations determine and comply with their regulatory responsibilities under . . . EPCRA." (Id. at 7).

2.      "[T]his Agreement resolves Respondent's civil liability for certain potential violations of the Clean Air Act, CERCLA and/or EPCRA at [Participating Company's] Farm(s) listed in Attachment A. The release and covenant not to sue found in paragraph 26 resolves only violations identified and quantified by applying the Emissions-Estimating Methodologies developed using data from the national air emissions monitoring study described herein." (Id.).

3.      "EPA releases and covenants not to sue Respondent, with respect to the listed Emission Units located at the Farm(s) in Attachment A, for: . . . civil violations of . . . EPCRA section 304 from air emissions of . . . Ammonia (NH3) that are not singular unexpected or accidental releases such as those caused by an explosion, fire or other abnormal occurrence." (Id. at 8).

4.      "[F]or any Farm that confines more than 10 times the 'large Concentrated Animal Feeding Operation' threshold of an animal species, the animal feeding operation [must] provide[] to the National Response Center (NRC) and to the relevant local and state emergency response authorities written notice describing its location and stating substantially as follows: This operation raises [species] and may generate routine air emissions of

9

Ammonia in excess of the reportable quantity of 100 pounds per 24 hours. A rough estimate of those emissions is [—] pounds per 24 hours, but this estimate could be substantially above or below the actual emission rate, which is being determined through an ongoing monitoring study in cooperation with the U.S. Environmental Protection Agency. When that emission rate has been determined by this study, we will notify you of any reportable releases pursuant to . . . EPCRA section 304." (Id.).

5.    "Within 120 days after EPA has published Emissions-Estimating Methodologies applicable to the Emission Units at Respondent's Facility, Respondent [must] report[] all Qualifying Releases of . . . Ammonia (NH3) in accordance with . . . section 304 of EPCRA." (Id. at 9).

6.    "If EPA's Science Advisory Board determines that EPA is unable to publish Emissions-Estimating Methodologies applicable to a particular type of Emission Unit in Attachment A within 18 months of the conclusion of the monitoring period because of inadequate data, EPA will attempt to resolve such data problems as soon as possible." (Id.).

7.    "EPA will notify Respondent if EPA has determined that it cannot develop Emissions-Estimating Methodologies for any Emission Units listed in Attachment A. . . . The releases and covenants not to sue . . . shall cover potential violations that occur on or before 120 days after the date the notice is mailed." (Id. at 10).

8.    "The execution of this Agreement is not an admission of liability by Respondent, and Respondent neither admits nor denies that it has violated any provisions of . . . EPCRA." (Id.).

EPA subsequently published its July 12, 2005, Notice in the Federal Register stating that it had received and reviewed comments on the Air Compliance Agreement and determined that "no changes are needed." (July 12, 2005 Notice, 70 Fed. Reg. 40017 (DE 53-7) at 3). EPA entered into agreements containing identical terms as the Air Compliance Agreement with over 2,500 animal feeding operations, covering approximately 14,000 farms. (Pls' Statement of Facts ¶ 4; Def's Statement of Facts ¶ 4).

On July 27, 2005, EPA and defendant entered into the Shellbank Agreement, which contains identical terms to the Air Compliance Agreement, except that the initial reference to "Participating

Company" is replaced with "The Hanor Company of Wisconsin, LLC and Kronseder Farms, Inc." (Shellbank Agreement (DE 15-1) at 5; see also Pls' Statement of Facts ¶ 4; Def's Statement of Facts ¶ 4)). The Shellbank Agreement is executed by defendant as "Animal Owner/Farm Operator" and by Kronseder Farms, Inc., as "Land Owner." (Shellbank Agreement (DE 15-1) at 28). Attachment A to the agreement identifies and describes the "Farms and Emissions Units covered by" the Shellbank Agreement, as Shellbank Farm, located at Rt Box 119, Battleboro, North Carolina, which has units containing 2744 "sows," 3048 "nursery pigs," and 4980 "finishing pigs." (Id. at 46).

The EPA Environmental Appeals Board ratified the Air Compliance Agreement, as applicable to defendant through the Shellbank Agreement, on April 17, 2006, thus becoming a final agency action. (Pls' Statement of Facts ¶ 14; see also Final Order, In re: Consent Agreements and Proposed Final Orders for Animal Feeding Operations (DE 15-3) at 3). Defendant satisfied its obligation to make payments to the monitoring fund under the terms of the Air Compliance Agreement, by paying $2,500.00. (Pls' Statement of Facts ¶ 15; Def's Statement of Facts ¶ 15; see Air Compliance Agreement (DE 53-3) at 11).

EPA commenced the National Air Emissions Monitoring Study (also referenced as "NAEMS"), described in the Air Compliance Agreement, in the summer of 2007. (Pls' Statement of Facts ¶ 16; Def's Statement of Facts ¶ 16; see Air Compliance Agreement (DE 53-3) at 7). On December 18, 2008, EPA published the 2008 Exemption Rule, which exempted smaller animal feeding operations (not including Shellbank) from "EPCRA section 304 notification requirements." (2008 Exemption Rule, 73 Fed. Reg.76948 (DE 53-10) at 5). A February 2009 EPA publication summarizing the 2008 Exemption Rule states:

**You are Not Required to Report If:**

• You have reported continuous releases in the past and your continuous release report is up to date . . .  or

• Your releases are less than the RQ.

Moreover, EPA does not expect farms participating in the Agency's Animal Feeding Operation Air Compliance Agreement (70 Fed. Reg. 4958), and that are in compliance with the terms of the Agreement, to report at this time. . . .

EPA is working on developing emission estimating methodologies based in part on the data collected in the National Air Emissions Monitoring Study, which is scheduled for completion at the end of 2009 with the final report to be complete in 2011.

(EPA, Office of Solid Waste and Emergency Response, February 2009 (DE 57-5) at 3).

In the January 19, 2011, Call for Information, EPA announced that it had collected data as part of the National Air Emissions Monitoring Study, under the terms of the Air Compliance Agreement, and that "EPA plans to use these data to develop [emissions-estimating methodologies] for [animal feeding operations], which will help [animal feeding operations] determine and comply with their regulatory responsibilities under . . . EPCRA." (January 19, 2011, Call for Information, 76 Fed. Reg. 3060 (DE 53-5) at 3).  EPA stated that it will use data generated from the National Air Emissions Monitoring Study "and all other available, relevant data to develop [emissions-estimating methodologies]."  (Id.).  EPA at that time recognized that certain types of data were not generated from the National Air Emissions Monitoring Study:

[W]e acknowlege the recommendation made by the [2003 National Academy of Sciences Report] that EPA develop a process-based modeling approach . . . to determine emissions from [animal feeding operations].  Unfortunately, manure land application sites, which are a necessary component for developing a process-based approach, were not part of the [National Air Emissions Monitoring Study].  Although our current focus is on developing the [emissions-estimating methodologies], we envision developing a process-based modeling approach at a later date.

(Id.).  EPA requested "quality-assured emissions and process data that are relevant to developing emissions-estimating methodologies," to be received on or before March 7, 2011. (Id. at 2).

On February 17, 2012,  Stephen D. Page, Director, EPA Office of Air Quality Planning and Standards, provided a memorandum to Ed Hanlon, Designated Federal Officer, Animal Feeding Operations Emissions Review Panel, EPA Science Advisory Board Staff Office, (hereinafter the "Science Advisory Board"), in which he reported that EPA had completed the National Air Emissions Monitoring Study, had "carefully considered the data collected as part of" that study, and was requesting the Science Advisory Board to "refine and comment upon our work thus far to create [emissions-estimating methodologies]."  (DE 57-8 at 2). In attachment thereto, EPA commented on factors influencing the determination of emissions-estimating methodologies for ammonia from swine lagoons:

> lagoon . . . emissions are influenced by several factors, one of these being lagoon . . . temperature.  To ensure that the dataset used to develop the draft [emissions-estimating methodologies] represented all seasonal meteorological conditions for the entire two year monitoring period, the EPA decided to combine the swine and dairy data. . . . [T]he EPA developed three sets of draft [emissions-estimating methodologies], using the paired combinations of . . . static variables (i.e., animal type, surface area, farm size) and . . . continuous variables representing meteorological conditions (i.e., temperature, atmospheric pressure, humidity, wind speed, solar radiation).

(Id. at 5-6).

On April 19, 2013, David T. Allen, Chair, the Science Advisory Board, sent a letter to Bob Perciasepe ("Perciasepe"), Acting Administrator, EPA, regarding the Science Advisory Board's response to EPAs request to refine and comment upon EPA's draft emissions-estimating methodologies, which includes the following statements:

> 1.    "The 2005 [Air Compliance Agreement] . . . provides that, if the [Science Advisory Board] decides that the available data are not adequate to support

development of the [emissions-estimating methodologies], then the EPA can delay development of the [emissions-estimating methodologies] until adequate data are available." (DE 53-8 at 2).

2. "[T]he [Science Advisory Board] concludes that the EPA has developed statistical models based on combined data sets and predictor variables which have limited the ability of the models to predict emissions beyond the small number of farms in the dataset. . . . The [Science Advisory Board] recommends that the EPA not apply the current versions of the statistical and modeling tools for estimating emissions beyond the farms in EPA's data set." (Id. at 3).

3. "The [Science Advisory Board] strongly recommends that the EPA develop a process-based modeling approach to predict air emissions from broiler confinement facilities and swine and dairy lagoons/basins. Process-based models would be more likely to be successful in representing a broad range of conditions than the current models because process-based models represent the chemical, biological and physical processes and constraints associated with emissions. This recommendation is consistent with recommendations provided to the EPA in the 2003 [National Academy of Sciences Report]." (Id.).

4. "The [Science Advisory Board] recognizes that the EPA may need to apply statistical approaches to assess emissions while it is developing and evaluating process-based models. The [Science Advisory Board] provides suggestions in this report to improve the agency's statistical approach for developing [emissions-estimating methodologies]." (Id. at 4).

On July 15, 2013, Perciasepe responded to the April 19, 2013, letter from the Science

Advisory Board, including the following statements:

We will carefully consider the [Science Advisory Board's] analysis and recommendations in developing emissions-estimating methodologies for the animal-feeding-operation sectors covered under the EPA's [Air Compliance Agreement]. The [Science Advisory Board's] information will guide our next steps as we continue to respond to the 2003 [National Academy of Sciences Report] recommendations on how to account for air emissions from animal-feeding operations. I assure you that we will work diligently in the coming months to develop appropriate emissions estimating methodologies for animal-feeding operations throughout the U.S.

(DE 57-9 at 2).

14

The August 18, 2014, Congressional Research Service Report states, as of that time, "EPA has not formally responded to the [Science Advisory Board's] criticisms, but the agency is reportedly reprocessing data from the study and trying to obtain datasets from other published studies in order to address issues raised by its advisors. EPA has not indicated when it will complete the process. Environmental groups are frustrated with EPA's delays . . . ." (DE 57-3 at 17).

On August 20, 2015, Robert Bookman, Chief, Chemical Management and Emergency Planning Section, of EPA, Region 4, sent a letter to defendant, stating that the EPA, Region 4 "EPCRA[] program has initiated an investigation of [the] Shellbank facility," and requested response to a series of 19 question, including: "[p]rovide the maximum calculated quantity of ammonia emissions for a 24-hour period." (DE 57-10).

The August 24, 2016, EPA Final Rule, pertaining to national ambient air quality standards under the Clean Air Act, states:

> Updated emissions estimating methodologies for animal feeding operations are under development using data collected during the period 2007-2009 from representative operations pursuant to the National Air Emissions Monitoring Study. . . . The EPA continues to make progress in using these data; however the full use and implementation of new methods based on these data is not a prerequisite for progress on considering ammonia . . . [for Clean Air Act] purposes. . . . The EPA and USDA are continuing to work collaboratively to better understand agricultural ammonia related emissions in order to more accurately represent the emissions and impacts of ammonia . . . .

(Aug. 24, 2016, EPA Final Rule, 81 Fed. Reg. 58033 (DE 53-6) at 6).

The 2017 EPA Office of Inspector General Report states the following regarding EPA address of emissions-estimating methodologies under the Air Compliance Act:

1.     "At the time we finished our review in May 2017, the EPA had not finalized any draft [emissions-estimating methodologies], or developed any additional draft [emissions-estimating methodologies]." (2017 EPA Office of Inspector General Report (DE 69-2) at 18).

2.	"A lack of expertise and resources slowed the agency's work on the EEMs in recent years. According to EPA managers, the agency in recent years did not have staff with combined expertise in agricultural emissions, air quality and statistical analysis. At the time the NAEMS protocol was developed, the EPA had more applicable expertise, but the key staff involved in the NAEMS protocol development retired. Further, competing priorities resulted in the EPA's Office of Air and Radiation putting the EEM effort largely on hold. The EPA had dedicated few agency resources to develop EEMs since the SAB's 2013 final report. The few remaining agency staff who worked on the NAEMS and subsequent data analysis were reassigned to other work, and the EPA stopped funding the contract for NAEMS analysis." (Id. at 23).

3.	"The EPA's most recent draft EEM development work plan, dated March 2016, provided a general framework for how the EPA intended to finish all planned EEMs. The draft plan stated that a new staff person with appropriate expertise, along with student contractor support, would complete the EEMs. The EPA hired the new staff person and a student contractor in January 2017 but had not yet finalized timeframes for completing EEM development." (Id.).

In addition, the 2017 Office of Inspector General Report states that EPA had adopted its recommendation "with corrective action pending," with a "Planned Completion Date" of September 30, 2018, for the following: "For any emission source and pollutant combinations for which the [EPA] determines it cannot develop emission estimating methodologies, notify Air Compliance Agreement participants of this determination, and that the release and covenant not to sue for those emission sources and pollutant types will expire in accordance with paragraph 38 of the 2005 Air Compliance Agreement." (Id. at 34).

## COURT'S DISCUSSION

A.	Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based

on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.     Analysis

1.     Plaintiffs' motion

Plaintiffs seek partial summary judgment in their favor "on the issue of defendant['s] . . . diligent prosecution affirmative defense," in which defendant asserts that plaintiffs are "barred from bringing this action pursuant to 42 U.S.C. § 11046(e), by virtue of the Shellbank Agreement." (M. for Sum. J. (DE 50) at 1; Answer (DE 35) at 14).

Before analyzing the issues associated with this affirmative defense, it is helpful to place it in context of EPCRA and the claim plaintiffs assert in this case. EPCRA requires an owner or operator of a facility that releases "an extremely hazardous substance," which term includes ammonia in excess of 100 pounds, to provide an emergency notification in the manner specified in the statute. 42 U.S.C. § 11004(a)(1); see 40 C.F.R. Pt. 355, App. A. In particular, EPCRA requires the owner or operator to give an initial notification "immediately after the release . . . by such means as telephone, radio, or in person" to a local coordinator for an emergency planning committee, which may be comprised of law enforcement, state and local officials, and other health and environmental officials. 42 U.S.C. §§ 11001(c) & 11004(b). In addition, as most pertinent here, EPCRA requires a "written followup emergency notice" to the same coordinator, providing additional information about the release, including "actions taken to respond to and contain the release." 42 U.S.C. § 11004(c).

EPCRA provides that the EPA may impose statutory civil penalties up to $25,000 per day (adjusted for inflation by regulation to $37,500.00 per day) for each day that an owner or operator fails to make notifications as required, and that any owner who willfully fails to do so faces criminal penalties up to two years imprisonment.  42 U.S.C. § 11045(b); 40 C.F.R. § 19.4.  EPCRA provides authority for "[c]itizen suits" for certain types of violations, including in pertinent part the following:

> Except as provided in subsection (e) of this section, any person may commence a civil action on his own behalf against the following:
> (A) An owner or operator of a facility for failure to do any of the following:
> (i) Submit a followup emergency notice under section 11004(c) of this title. . . .

42 U.S.C. § 11046(a).

The subsection (e) exception, which is subject of defendant's affirmative defense in this case and the subject of plaintiffs' instant motion for summary judgment, provides as follows:

> (e) Limitation
> No action may be commenced under subsection (a) of this section against an owner or operator of a facility if the Administrator has commenced and is diligently pursuing an administrative order or civil action to enforce the requirement concerned or to impose a civil penalty under this Act with respect to the violation of the requirement.

42 U.S.C. § 11046(e).  Hereinafter, the court will refer to this subsection (e) exception as the "EPCRA diligent pursuit exception" to citizen suits.

Neither the Supreme Court nor the Fourth Circuit has applied the EPCRA diligent pursuit exception.  This court previously discussed application of the exception in the context of defendant's motion to dismiss.  See Hanor I, 2016 WL 3435192 at *5-7. Now that the court is considering application of the exception on the basis of a more complete record, the court has occasion to reconsider its prior exposition of the law pertaining to the diligent pursuit exception in EPCRA.  The court declines to adopt in its entirety its prior exposition of the law, particularly discussion in dicta

considering case law interpreting Clean Water Act civil enforcement provisions. See id. While the court maintains its holding denying defendant's motion to dismiss in that order, the court declines to adopt as law of the case the discussion of law interpreting the EPCRA diligent pursuit exception, in those instances where such discussion is inconsistent with the determinations set forth herein. The court addresses anew application of the EPCRA diligent pursuit exception based on its plain language herein.

The EPCRA diligent pursuit exception contains two components pertinent to the analysis here. First, EPA must have commenced and be "pursuing an administrative order . . . to enforce the requirement concerned." 42 U.S.C. § 11046(e). Second, EPA must be doing so "diligently." Id. The court will address each of these issues in turn.

### a. Pursuit of Administrative Order

Viewing the facts in the light most favorable to defendant, EPA's actions in entering into and implementing the Air Compliance Agreement constitute commencement and pursuit of an administrative order to enforce the requirement concerned, which here is the requirement to make emergency notices of releases of ammonia from Shellbank in accordance with 42 U.S.C. § 11004. The Air Compliance Agreement constitutes commencement and pursuit of such an administrative order in two respects set forth in turn below.

### i. Entry into Air Compliance Agreement

First, EPA's actions in entering into the Air Compliance Agreement constitute commencement and pursuit of an administrative order to enforce the requirement of making emergency notices of releases from animal feeding operations, including Shellbank. As described in the January 31, 2005, Notice, EPA offered animal feeding operations, such as defendant, the

20

opportunity to enter into the Air Compliance Agreement, the satisfaction of which "will trigger the obligation of participating [animal feeding operations] to determine their emissions . . . and to make any requisite hazardous release notices under . . . EPCRA." (Jan. 31, 2005 Notice, 70 Fed. Reg. 4958 (DE 53-3) at 4) (emphasis added). Further, EPA stated: "While EPA has the authority on a case-by-case basis to require [animal feeding operations] to monitor their emissions and to come into compliance with applicable Federal laws, . . . EPA believes that the Air Compliance Agreement will be the quickest and most effective way to . . . bring all participating [animal feeding operations] into compliance with all applicable regulatory requirements." (Id. at 3) (emphasis added). In addition, EPA stated, "The release and covenant not to sue will cover an [animal feeding operation's] liability for failing to comply with certain provisions of . . . EPCRA, . . . up to the time the [animal feeding operation] reports its releases under . . . EPCRA . . . ." (Id. at 4) (emphasis added). In this manner, EPA entered into the Air Compliance Agreement, including its associated final administrative order, to enforce the requirement concerned in this lawsuit, particularly the requirement to make emergency notifications under EPCRA.

The text of the Air Compliance Agreement further confirms its nature and purpose as an order to enforce the emergency notification requirement. Indeed, it states prominently, "[t]he purpose of this Agreement is to ensure that [Participating Company] complies with . . . applicable release notification provisions of . . . EPCRA." (Id. at 7) (emphasis added). It provides that the release and covenant not to sue contained therein resolves "violations identified and quantified by applying the Emissions-Estimating Methodologies developed using data from the national air emissions monitoring study described herein." (Id.). Furthermore, it expressly provides for an interim continuing notification requirement for "any Farm that confines more than 10 times the

'large Concentrated Animal Feeding Operation' threshold of an animal species." (Id. at 8). In this manner, the Air Compliance Agreement addresses immediate reporting requirements for certain large-scale farms and it also addresses, on a delayed schedule, reporting requirements for all other farms subject to its terms.

ii. Implementing Air Compliance Agreement

Second, EPA's actions in implementing the terms of the Air Compliance Agreement constitute pursuit of that administrative order to enforce the requirement of making emergency notices of releases from animal feeding operations. The Air Compliance Agreement provides for an extended period of administrative action addressing the requirements for emergency notifications under EPCRA. EPA recognized in its January 31, 2005, Notice that "as with any large and complex effort, this work must be conducted over a period of years." (Id. at 5). EPA "expect[ed] that the monitoring will begin in 2005 and continue for 2 years. Two years of monitoring is the minimum time needed . . . . Within 18 months after the conclusion of the nationwide emissions monitoring study, EPA expects that it will publish on its Web site, on a rolling basis as work is completed, the methodologies for estimating emissions . . . . (Id.). In the Air Compliance Agreement, EPA recognized that if it "is unable to publish Emissions-Estimating Methodologies applicable to a particular type of Emission Unit in Attachment A within 18 months of the conclusion of the monitoring period because of inadequate data, EPA will attempt to resolve such data problems as soon as possible." (Id. at 9). In this manner, where the Air Compliance Agreement provides for a period of administrative action for implementation of its terms, such administrative action constitutes pursuit of "an administrative order . . . to enforce the requirement concerned." 42 U.S.C. § 11046(e).

In addition, viewing the facts in the light most favorable to defendant, EPA is still pursuing the terms of the Air Compliance Agreement, including as applied to defendant in the Shellbank Agreement. As an initial matter, Shellbank Farm does not meet the size threshold of confining "more than 10 times the 'large Concentrated Animal Feeding Operation' threshold of an animal species." (Id. at 8).[2] Accordingly, Shellbank was not required by the Air Compliance Agreement to make a notification of ongoing air emissions of ammonia in excess of 100 pounds per 24 hours. (See id.). After the Air Compliance Agreement was ratified in 2006, and after it had commenced the National Air Emissions Monitoring Study, EPA confirmed both that it did "not expect farms" participating the agreement "to report [continuing releases] at this time," and that EPA was "working on developing emission estimating methodologies," per the terms of the Air Compliance Agreement. (EPA, Office of Solid Waste and Emergency Response, February 2009 (DE 57-5) at 3).[3]

EPA's pursuit of implementation of the Air Compliance Agreement has continued up through at least 2017: In January 2011, it announced that it had collected data to assist with developing emissions-estimating methodologies; in February 2012, it requested input from the Science Advisory Board, noting it had developed draft emissions-estimating methodologies; in April

---

[2] Shellbank Farm has units containing 2744 "sows," 3048 "nursery pigs," and 4980 "finishing pigs." (Shellbank Agreement (DE 15-1) at 46). The thresholds for "Large Concentrated Animal Feeding Operation[s]" are "(a) 2,500 swine weighing more than 55 pounds; and (b) 10,000 swine weighing less than 55 pounds." (Jan. 31, 2005, Notice, 70 Fed. Reg. 4963 (DE 53-3) at 8 n.3).

[3] It is not determinative to the present analysis that EPA imposed a then-permanent "reporting exemption" for certain farms, unlike defendant, below the threshold for "large [concentrated animal feeding operations]," in its 2008 Exemption Rule, (73 Fed. Reg.76948 (DE 53-10) at 5), which rule was since vacated by the United States Court of Appeals for the District of Columbia Circuit in Waterkeeper Alliance v. EPA, 853 F.3d 527, 537-38 (D.C. Cir. 2017). One statement by EPA in the 2008 Exemption Rule suggests that EPA still expected large concentrated animal feeding operations to continue to make EPCRA continuous release reports "reflect[ing] good faith estimates from reporting entities." (73 Fed. Reg. 76952). This statement creates, at best, a genuine issue of fact as to EPA's expectations, given conflicting reporting requirements in the Air Compliance Agreement and EPA's contrary statement in its February 2009 publication summarizing the 2008 Exemption Rule. (EPA, Office of Solid Waste and Emergency Response, February 2009 (DE 57-5) at 3).

2013, the Science Advisory Board provided comments and recommendations; in July 2013, EPA's acting administrator assured continued work to develop emissions-estimating methodologies; in August 2016, EPA reported that "updated emissions-estimating methodologies for animal feeding operations are under development"; in September 2017, EPA Office of Inspector General reported that EPA had "corrective action pending," with a "Planned Completion Date" of September 30, 2018, for notifying "Air Compliance Agreement participants" that it cannot develop emission estimating methodologies.[4] Thus, for purposes of the instant analysis of whether EPA is "pursuing an administrative order," 42 U.S.C. § 11046(e), all of these activities confirm that EPA is doing so. The court leaves for further discussion later in this order, whether such activity constitutes "diligen[ce]." Id.

In sum, based on the foregoing, EPA commenced and is pursuing an administrative order to enforce the emergency notification requirement of EPCRA that is the subject of plaintiffs' claim in this case.

### iii.   Plaintiffs' Arguments

Plaintiffs argue that the Air Compliance Agreement does not trigger the EPCRA diligent pursuit exception because it does not enforce or address "the same violations as those alleged in the complaint." (Pl's Reply (DE 60) at 5; Pl's Mem. (DE 51) at 21).  This argument misses the mark, however, because the diligent pursuit exception does not require EPA to be pursuing "the same violations as those alleged" in a civil action, (id.), but rather requires EPA to be pursuing "an administrative order . . . to enforce the requirement concerned."  42 U.S.C. § 11046(e) (emphasis

---

[4] See January 19, 2011, Call for Information, 76 Fed. Reg. 3060 (DE 53-5) at 3; February 17, 2012, letter and report (DE 57-8 at 2, 5-6); April 19, 2013, letter and report (DE 53-8) at 2-4; July 15, 2013, letter (DE 57-9) at 2; Aug. 24, 2016, EPA Final Rule, 81 Fed. Reg. 58033 (DE 53-6) at 6;  2017 EPA Office of Inspector General report (DE 69-2) at 18, 34.

added). Through use of the phrase "the requirement concerned," the statute refers by reference to the requirements listed at § 11046(a)(1)(A), upon which a citizen suit can be brought, particularly the requirements to:

> (i) Submit a followup emergency notice under section 11004(c) of this title.
>
> (ii) Submit a material safety data sheet or a list under section 11021(a) of this title.
>
> (iii) Complete and submit an inventory form under section 11022(a) of this title . . . .
>
> (iv) Complete and submit a toxic chemical release form under section 11023(a) of this title.

42 U.S.C. § 11046(a)(1)(A) (emphasis added). As noted previously, the requirement concerned in the present action is the emphasized requirement to "[s]ubmit a followup emergency notice under section 11004(c) of this title." Id. Plaintiffs allege in the complaint that defendant failed to do so for releases of ammonia from July 2010 to the date of the complaint in 2015, and ongoing. (Compl. ¶¶ 85-93). The Air Compliance Agreement comprises pursuit of an administrative order to enforce that same "requirement concerned," 42 U.S.C. § 11046(e), in that implementation of the Air Compliance Agreement will dictate whether and when defendant, or any other animal feeding operation, is required to submit an EPCRA notification, including followup emergency notification, for its emissions of ammonia.

Specifically, under the Air Compliance Agreement, "EPA's publication of the emissions estimating methodologies will trigger the obligation of participating [animal feeding operations] to determine their emissions . . . and to make any requisite hazardous release notices under . . . EPCRA." (Jan. 31, 2005 Notice, 70 Fed. Reg. 4958 (DE 53-3) at 3). at 4) (emphasis added). "Within 120 days after EPA has published Emissions-Estimating Methodologies applicable to the Emission Units at Respondent's Facility, Respondent [must] report[] all Qualifying Releases of . .

. Ammonia (NH3) in accordance with . . . section 304 of EPCRA." (Id. at 9) (emphasis added).  In turn, a "Qualifying Release[]" is defined in the Air Compliance Agreement as "a release that triggers a reporting requirement under . . . section 304 of EPCRA," (id. at 8) (emphasis added), which is not time-limited.  Accordingly, the reporting requirements addressed by the Air Compliance Act constitute the same reporting requirements at issue in this action.

Plaintiffs cite to the case Group Against Smog & Pollution, Inc. v. Shenango Inc., 810 F.3d 116, 128 (3d Cir. 2016), for the proposition that the diligent pursuit exception is triggered by analysis into whether the agency "seeks to remedy the same violations as [a] duplicative civilian action."  While the court cited to this case previously for this proposition also in its order on motion to dismiss, see Hanor I, 2016 WL 3435192 at *6, the court disavows reliance thereon for present purposes as erroneous, for several reasons.  First, Group Against Smog is not a case interpreting the diligent pursuit exception in EPCRA; indeed it does not even mention EPCRA.  Rather, it interprets a "diligent prosecut[ion]" bar to citizens suits in the Clean Air Act, which turns on whether the government "has commenced and is diligently prosecuting a civil action . . . to require compliance" with the emission standard or limitation as set forth in the Clean Air Act.  Id. at 126 (quoting 42 U.S.C. § 7604(b)(1)(B)) (emphasis added).  Unlike in Group Against Smog, this court is not determining here whether EPA has "prosecut[ed] a civil action . . . to require compliance" with a particular statutory standard.  Here, there is no statutory basis to require an identity of alleged "violations" in both a citizen suit and an civil action brought by the government, because the instant case involves an administrative order and not a civil action brought by the government.

Second, the Air Compliance Agreement presents a unique administrative circumstance, not reflected in the facts of Group Against Smog, where the EPA has pursued a certain type of

administrative order expressly because it is unable to reliably identify thresholds, factors, or methods, for determining violations of the statutory requirements at issue in the citizen suit. Indeed, EPA recognized:

> While EPA has the authority on a case-by-case basis to require [animal feeding operations] to monitor their emissions and to come into compliance with applicable Federal laws, that process has proven to be difficult and time consuming, partly due to the <u>uncertainty regarding emissions from [animal feeding operations]</u>, which was reiterated in [the 2003 National Academy of Sciences Report] . . . . Consequently, EPA believes that the Air Compliance Agreement will be the quickest and most effective way to address the <u>current uncertainty regarding emissions from [animal feeding operations]</u> and to bring all participating [animal feeding operations] into compliance with all applicable regulatory requirements.

((Jan. 31, 2005 Notice, 70 Fed. Reg. 4958 (DE 53-3) at 3) (emphasis added); <u>see also</u> 2003 National Academy of Sciences Report (DE 57-2) at 5 ("Available estimates of emission factors, rates, and concentrations are sufficiently uncertain that they provide a <u>poor basis</u> for regulating or managing air emissions from [animal feeding operations].") (emphasis added)). There is no indication in the text of the EPCRA diligent pursuit exception that Congress intended to require the enforcing government agency to identify the same violations alleged in a citizen suit, where the enforcing government agency expressly has deferred the mechanism for determining violations until the conclusion of the administrative enforcement proceedings.

In this manner, the instant case is distinguishable, too, from other cases cited by plaintiffs where the courts rejected application of the diligent prosecution bar under the Clean Water Act, for example where a state government agency had taken the "current position that there is no methodology for assessing [state] narrative water quality standards." <u>OVEC v. Elk Run Coal Co.</u>, 24 F.Supp. 3d 532, 550 (S.D.W. Va. 2014); <u>see</u> <u>OVEC v. FOLA Coal Co.</u>, 845 F.3d 133, 145 (4th Cir. 2017) (agency provided informal guidance that it "would not pursue any enforcement action

based on conductivity or water quality standards"). In those cases, in contrast to the instant case, the government enforcing agency was not progressing in accordance with a formal structure for determining compliance, like the Air Compliance Agreement, which sets forth a plan for developing methodologies. The position of the agency in <u>Elk Run</u> and <u>FOLA</u>, as characterized by the court in that case, would be more closely equivalent to EPA announcing, upon the conclusion of the Air Compliance Agreement, that it is <u>unable</u> to determine any emissions-estimating methodologies applicable to animal feeding operations. Under the Air Compliance Agreement, at that point, the releases in the Air Compliance Agreement cease and reporting obligations resume under EPCRA. (<u>See</u> Jan. 31, 2005 Notice, 70 Fed. Reg. 4958 (DE 53-3) at 10).

Plaintiffs also argue that the Air Compliance Agreement does not trigger the EPCRA diligent pursuit exception because the Air Compliance Agreement has no "enforceable compliance aspects." (Pls' Mem (DE 51) at 28; Pls' Reply (DE 60) at 5). For this characterization, plaintiffs quote from the final order of the EPA Environmental Appeals Board ratifying the Air Compliance Agreement (Final Order, In re: Consent Agreements and Proposed Final Orders for Animal Feeding Operations (DE 15-3) at 9-10). Despite this characterization, however, the EPA Environmental Appeals Board ratified the Air Compliance Agreement, and determined that it constituted a valid settlement agreement that was "consistent with the well-settled principle that EPA <u>retains discretion as to how to bring a facility into compliance</u>." (<u>Id.</u> at 25) (emphasis added). It stated further that EPA "has broad discretion in choosing how best to bring a facility or group of facilities into compliance and [that it] further recognize[d] [EPA's] expertise in matters of <u>enforcement strategy</u>." (<u>Id.</u> at 26) (emphasis added). In other words, even though not characterized as having "enforceable compliance aspects," it is characterized as a mechanism for bringing facilities into compliance and a valid

28

enforcement strategy by EPA. In this respect, the Air Compliance Agreement meets the plain terms

of the EPCRA diligent pursuit exception because it is an "administrative order . . . to enforce the

requirement" of EPCRA notifications for animal feeding operations. 42 U.S.C. § 11046(e).

Plaintiffs also argue that EPA does not "have the power to indefinitely immunize HANOR

from EPCRA civil liability." (Pls' Mem (DE 51) at 22; Pls' Reply (DE 60) at 8). This argument

is unavailing for two reasons. First, the Air Compliance Agreement does not indefinitely immunize

defendant from EPCRA civil liability. Rather it defers defendant's obligation to follow EPCRA

reporting requirements for ongoing emissions of ammonia, among other pollutants, until 120 days

after EPA publishes emissions-estimating methodologies for animal feeding operations or until 120

days after EPA has determined that it cannot develop such emissions-estimating methodologies.

(See Jan. 31, 2005 Notice, 70 Fed. Reg. 4958 (DE 53-3) at 9, 10). At that time, defendant must

report "all Qualifying Releases of . . . Ammonia" from its facility. (Id. at 9). As noted by EPA

Environmental Appeals Board, the Air Compliance Agreement gives defendant a "release and

covenant not to sue for potential civil violations of specified requirements of [EPCRA] that may

have already occurred or that may occur during the study period." (Final Order, In re: Consent

Agreements and Proposed Final Orders for Animal Feeding Operations (DE 15-3) at 5) (emphasis

added).

Second, the issue of whether EPA had the power to act as set forth the Air Compliance

Agreement, regardless of how those actions are characterized, already was adjudicated and decided

at the time of the ratification of the Air Compliance Agreement. In particular, EPA Environmental

Appeals Board made "finding[s] as to the sufficiency of" the Air Compliance Agreement and

concluded that it "conform[s] to the general objectives of . . . EPCRA for [it] seek[s] to remedy

violations of [this] statute[.]" (Final Order, In re: Consent Agreements and Proposed Final Orders for Animal Feeding Operations (DE 15-3) at 21, 25) (emphasis added). Moreover, the United States Court of Appeals for the District of Columbia Circuit rejected, upon petition for review of the Air Compliance Agreement, the argument that "the Agreement exceeds EPA's authority under [EPCRA]," reasoning that the statute "grant[s] EPA broad enforcement authority and discretion, authorizing the agency to choose among various methods to penalize violators and achieve compliance." Ass'n of Irritated Residents v. E.P.A., 494 F.3d 1027, 1036 (D.C. Cir. 2007).[5]

In summary, the Air Compliance Agreement reflects, in several respects, EPA's discretionary choice among multiple enforcement options to penalize violators and achieve compliance. First, it embodies EPA's choice to proceed with a project of nationwide scope, not limited solely to its application to defendant, or any other animal feeding operation "on a case-by-case basis." (Jan. 31, 2005 Notice, 70 Fed. Reg. 4958 (DE 53-3) at 5). Second, it reflects EPA's judgment that only the largest animal feeding operations, as a condition for entry into the Air Compliance Agreement, expressly must make a written notification of ongoing air emissions of ammonia in excess of 100 pounds per 24 hours. (Id. at 8). Finally, it embodies EPA's judgment that there is not a reasoned basis for requiring other animal feeding operations to make emergency notifications regarding ongoing ammonia emissions until EPA has determined whether it can publish emissions-estimating methodologies. (Id. at 9-10).

---

[5] Plaintiffs suggest that a statute of limitations provision in the Air Compliance Agreement, which tolls statute of limitations only until 2011, (see Jan. 31, 2005 Notice, 70 Fed. Reg. 4958 (DE 53-3) at 9), negates or undercuts its efficacy as an enforcement mechanism. While the court recognizes this limits the efficacy of the Air Compliance Agreement, for all the reasons stated in the text above, the court disagrees that this altogether negates EPA's ability through the Air Compliance Agreement to enforce nationwide EPCRA requirements for animal feeding operations.

For all these reasons, defendant has demonstrated a genuine issue of fact regarding whether entering into and implementing the Air Compliance Agreement constitutes commencement and pursuit of an administrative order to enforce the pertinent EPCRA notification requirement in 42 U.S.C. § 11004.

### b. Diligence

As noted previously, section 11046(e) acts as a bar to a citizen suit where EPA is "diligently pursuing an administrative order" at the time of the commencement of the action. Having already addressed whether implementation of the Air Compliance Agreement constitutes pursuit of an administrative order to enforce the EPCRA notification requirement, the issue remains whether EPA was "diligently pursuing" that goal at the time of the commencement of this action. Viewing the facts in the light most favorable to defendant, there is a genuine issue of material fact regarding this issue.

Prior to commencement of this action on August 1, 2015, EPA had announced in January 2011 that it had collected data as part of the National Air Emissions Monitoring Study, under the terms of the Air Compliance Agreement, and that it planned to use such data "and all other available, relevant data to develop [emissions-estimating methodologies]." (January 19, 2011, Call for Information, 76 Fed. Reg. 3060 (DE 53-5) at 3). It had provided a detailed report of draft emissions-estimating methodologies to the Science Advisory Board, in February 2012, and it had received detailed suggestions from that board in April 2013, for "improv[ing] the agency's statistical approach for developing" emissions-estimating methodologies. (DE 53-8 at 2-4). In July 2013, the acting administrator of EPA responded that EPA "will carefully consider the [Science Advisory Board's] analysis and recommendations in developing emissions-estimating methodologies," noting

that EPA was "continu[ing] to respond to the 2003 [National Academy of Sciences Report] recommendations on how to account for air emissions from animal-feeding operations." Further, he stated, "I assure you that we will work diligently in the coming months to develop appropriate emissions estimating methodologies." (DE 57-9 at 2).

In light of the scope of work contemplated under the Air Compliance Agreement, as further elaborated in EPA's 2012 report and the Science Advisory Board's 2013 report, it is reasonable to infer that EPA diligently was continuing to work towards developing emissions-estimating methodologies at the time of the commencement of this action on August 1, 2015. In particular, EPA commented in the 2012 report on factors influencing the determination of emissions-estimating methodologies for ammonia from swine lagoons, such as "static variables (i.e., animal type, surface area, farm size) and . . . continuous variables representing meteorological conditions (i.e., temperature, atmospheric pressure, humidity, wind speed, solar radiation)." (DE 57-8 at 5-6). It is reasonable to infer the Science Advisory Board considerably augmented the complexity of this task by advising that "EPA has developed statistical models based on combined data sets and predictor variables which have limited the ability of the models to predict emissions beyond the small number of farms in the dataset," and by recommending that "EPA not apply the current versions of the statistical and modeling tools for estimating emissions beyond the farms in EPA's data set." (DE 53-8 at 3).

Given that an administrative agency's "diligence is presumed," Piney Run Peservation Association v. Carroll County, Md., 523 F.3d 453, 459 (4th Cir. 2008), and given that the court must draw reasonable inferences in the light most favorable to the non-movant, there is a genuine issue

of fact as to whether EPA was diligently pursuing its goals set forth in the Air Compliance Agreement at the time of commencement of this lawsuit.

Plaintiffs argue, nonetheless, that EPA has not been diligent because EPA has not met "deadlines" set forth in the Air Compliance Agreement. (Pls' Mem (DE 51) at 29; see id. at 32, 36). The Air Compliance Agreement, however, does not set forth "deadlines" upon which success of the agreement is conditioned. In its notice regarding the Air Compliance Agreement, EPA stated that it expected monitoring to begin in 2005 and continue for two years, but it noted that "[t]wo years of monitoring is the minimum time needed." (See Jan. 31, 2005 Notice, 70 Fed. Reg. 4958 (DE 53-3) at 5). EPA also expected to start publishing emissions-estimating methodologies within 18 months after completion of the monitoring study, but it noted "[i]f EPA's Science Advisory Board determines that EPA is unable to publish Emissions-Estimating Methodologies applicable to a particular type of Emission Unit in Attachment A within 18 months of the conclusion of the monitoring period because of inadequate data, EPA will attempt to resolve such data problems as soon as possible." (Id. at 9). As discussed above, EPA's Science Advisory Board in fact made precisely such determination, setting in motion a complex and difficult process of addressing inadequacies in its data and determining statistically based emissions-estimating methodologies. (See DE 53-8 at 2-4; DE 57-9 at 2). Accordingly, EPA's failure to meet timing expectations set forth in the Air Compliance Agreement does not compel a determination that it has not been acting diligently.

Plaintiffs suggest that the Science Advisory Board's criticism of EPA's prior data collection tends to show a lack of diligence on the part of EPA. Viewing the facts in the light most favorable to defendant, however, the interaction between the Science Advisory Board and EPA shows

concerted effort to address the multifaceted problem of emissions-estimating methodologies. Indeed, drawing inferences in this manner, the Science Advisory Board criticism provides a rational justification for EPA's extended delay in developing emissions-estimating methodologies.

Plaintiffs also suggest that a ten-year period or more of delay, during which time animal feeding operations are not required to report ongoing releases o ammonia, is simply too long as a matter of law to demonstrate diligence. In this respect, plaintiffs seek to draw comparison between this case and others in which courts have found that a ten-year period of agency delay is too long to demonstrate diligence. For example, in <u>Jones v. City of Lakeland, Tennessee</u>, 224 F.3d 518, 522 (6th Cir. 2000), the court found an "administrative enforcement action over a ten-year period was inadequate" to address Clean Water Act violations by a city's discharge of raw sewage into a waterway, noting the state agency had "extended and waived the compliance deadlines of three, possibly four, of its sweetheart consent orders with the City." <u>Id.</u> Plaintiffs also seek comparison with <u>Piney Run</u>, in which the Fourth Circuit in context again of waterway discharges looked to whether an agency was proceeding under a "detailed schedule of compliance" and noting that the consent decree in that case required "immediate compliance with [a] thermal limitation." 523 F.3d at 459, 461 (quotations omitted).

Plaintiffs' argument seeking comparison to <u>Jones</u> and <u>Piney Run</u>, however, does not take into account the unique circumstances and nationwide scope of the Air Compliance Agreement. This is not an instance as in <u>Jones</u> where a single state or local agency has granted extension after extension to an individual polluter under the Clean Water Act. Nor is this an instance fitting into the standards articulated in <u>Piney Run</u>, where the court looked to whether a state agency was pursuing an individual polluter under a "detailed schedule of compliance." 523 F.3d at 459

(quotations omitted). Instead, the Air Compliance Agreement reflects widespread and longstanding recognition of challenges in estimating emissions for purposes of regulating or managing continuous release notifications by animal feeding operations. As noted previously, the National Academy of Sciences in 2003 recognized that "[a]vailable estimates of emission factors, rates, and concentration . . . provide a poor basis for regulating or managing air emissions from [animal feeding operations]." (2003 National Academy of Sciences Report (DE 57-2) at 5) (emphasis added). The Air Compliance Agreement itself expressly stated that determining compliance by animal feeding operations "has proven to be difficult and time consuming, partly due to the uncertainty regarding emissions from [animal feeding operations]." (See Jan. 31, 2005 Notice, 70 Fed. Reg. 4958 (DE 53-3) at 5). And, the EPA Science Advisory Board reiterated the complexity of the task in its report to EPA in recommending that "EPA not apply the current versions of the statistical and modeling tools for estimating emissions." (DE 53-8 at 15).

In sum, EPA is not acting in isolation inexplicably dragging its feet as to a single polluter; rather it is working under a complex framework to address animal feeding operations on a national basis. (See, e.g., Pls' Statement of Facts ¶ 4; Def's Statement of Facts ¶ 4 (stating that EPA entered into Air Compliance Agreement with over 2,500 animal feeding operations)). Plaintiffs' attempt to compare the instant case to others in much different circumstances is unavailing.

Plaintiffs additionally suggest, in response to the court's order requesting further briefing upon receipt of the 2017 EPA Office of Inspector General Report, that certain passages in the report bear upon EPA's lack of diligence. This court also suggested as much in its November 3, 2017, order directing further briefing that the 2017 Office of Inspector General Report, where it stated that the report "bears directly and comprehensively upon" EPA's administrative activities, regarding

which defendant has moved, in part, to obtain further discovery. (DE 70). Upon further consideration of the 2017 Office of Inspector General Report, the supplemental briefing ordered, and the applicable law, however, the court has determined that the significance of the 2017 Office of Inspector General Report to the instant analysis upon summary judgment is more limited than suggested by the court in its November 3, 2017, order.

Generally, the 2017 Office of Inspector General Report is admissible as a public record, under Federal Rule of Evidence 803(8), because it is a "record or statement of a public office" that sets forth "factual findings from a legally authorized investigation." Fed. R. Evid. 803(8). This does not resolve, however, the admissibility of every statement contained in the 2017 Office of Inspector General Report, for the truth of the matter asserted, particularly where the report is referencing statements of others. Such statements may be hearsay within hearsay, for which an exception to the hearsay rule must be identified before they are admissible for the truth of the matter asserted. See Fed. R. Evid. 803 (1972 Advisory Comm. Notes) ("In a hearsay situation, the declarant is, of course, a witness, and neither this rule nor Rule 804 dispenses with the requirement of firsthand knowledge."); see also Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 164 (1988) ("[C]ontrary to what is often assumed, the language of the Rule [803(8)] does not state that factual findings are admissible, but that reports setting forth factual findings are admissible.") (quotations omitted).

The following passage quoted previously, containing language also cited by plaintiffs in their supplemental briefing, falls within this category:

> A lack of expertise and resources slowed the agency's work on the EEMs in recent years. According to EPA managers, the agency in recent years did not have staff with combined expertise in agricultural emissions, air quality and statistical analysis. At the time the NAEMS protocol was developed, the EPA had more applicable expertise, but the key staff involved in the NAEMS protocol development retired. Further, competing priorities resulted in the EPA's Office of Air and Radiation

putting the EEM effort largely on hold. The EPA had dedicated few agency resources to develop EEMs since the SAB's 2013 final report. The few remaining agency staff who worked on the NAEMS and subsequent data analysis were reassigned to other work, and the EPA stopped funding the contract for NAEMS analysis.

(2017 EPA Office of Inspector General Report (DE 69-2) at 23) (emphasis added); see also id. at 16 (stating that the Office of Inspector General "interviewed EPA staff and managers . . . to gain an understanding of EPA actions to evaluate and address [animal feeding operations] air emissions," as well as other outside entities and individuals, to determine the "status of the [national air emissions monitoring study]." (emphasis added)).

Accordingly, while the 2017 EPA Office of Inspector General Report does itself serve as evidence of the Office of Inspector General's findings, conclusions, and recommendations made in 2017, the statements attributed to unspecified and unidentified "EPA managers" are not, without more, admissible for the truth of the matter asserted (i.e., that EPA dedicated few agency resources to developing emissions-estimating methodologies post 2013). While compelling, other remaining more generalized conclusions contained in the 2017 EPA Office of Inspector General Report, pointing out or criticizing the extent of delay by EPA, are not determinative to the instant analysis, particularly where, as here, the court must view the underlying facts in the light most favorable to defendant. Therefore, summary judgment is not warranted on the issue of "diligence" based on the 2017 EPA Office of Inspector General Report.

In sum, plaintiffs have not demonstrated the absence of a genuine issue of material fact on the application of defendant's EPCRA diligent pursuit exception affirmative defense. Plaintiffs' instant motion for summary judgment thus is denied.

2.     Defendant's Motion for Rule 56(d) Relief

Federal Rule of Civil Procedure 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  In this case, where the court has already determined as set forth above that plaintiffs' motion for summary judgment must be denied on the basis of the record before the court, defendant's motion for Rule 56(d) relief is denied as moot.  The court addresses further below the schedule for remaining activities in this case.

3.     Defendant's Motion for Partial Summary Judgment

As noted previously, in its motion for partial summary judgment, defendant seeks dismissal of part of plaintiffs' claims that are "seeking relief that exceed the authority granted by section 326(a) of EPCRA, 42 U.S.C. § 11046(a)."  (Def's M. for Sum. J (DE 55) at 1; see id. at 2). EPCRA provides authority for "[c]itizen suits" for certain types of violations, including in pertinent part the following:

> Except as provided in subsection (e) of this section, any person may commence a civil action on his own behalf against the following:
> (A) An owner or operator of a facility for failure to do any of the following:
> (i) Submit a followup emergency notice under section 11004(c) of this title. . . .

42 U.S.C. § 11046(a) (emphasis added).  By its plain terms, EPCRA does not provide authority for a citizen suit for failure to submit an initial emergency notice "immediately after the release" under 42 U.S.C. § 11004(b).  On this basis, to the extent plaintiffs seek to assert a claim based upon failure by defendant to submit an initial immediate emergency notice under § 11004(b), summary judgment against plaintiffs on such claim is warranted.

Here, plaintiffs' "cause of action" for "violation of EPCRA" is captioned as being based upon a "failure to submit <u>immediate</u> or follow-up emergency release notifications pursuant to 42 U.S.C. § 11004." (Compl. at p. 24) (emphasis added). Accordingly, where in this emphasized part plaintiffs seek to assert a cause of action based upon failure to submit immediate emergency release notifications, under 42 U.S.C. § 11004(b), summary judgment in part against plaintiffs on such claim is required.

Defendant, however, seeks to go one step further and obtain summary judgment on plaintiffs' "claim for relief contained at paragraph 4 on page 27 of the Complaint." (Prop. Order (DE 55-1)). The referenced paragraph is one of eight items enumerated in plaintiffs' "request for relief" at the conclusion of the complaint, also set forth at the beginning of this order. Paragraph four, as noted, requests to have the court "[o]rder Hanor to <u>immediately notify</u> the Edgecombe County Office of Emergency Services (the designated LEPC contact for Edgecombe County) and the North Carolina Department of Public Safety (the designated SERC contact for North Carolina) of the releases of reportable quantities of ammonia from Shellbank." (Compl. at p. 27) (emphasis added).

Defendant's motion, in this part, to have the court enter summary judgment on plaintiffs' fourth enumerated request for relief is premature. Where the court has not determined liability in this matter, the court has not had occasion to consider yet an appropriate remedy in the event liability is found, particularly where the requested relief is injunctive in nature. The court reserves for another day the issue raised by the parties' briefs whether the scope of relief awarded is cabined by the limitation on plaintiffs' cause of action authorized under the statute.

In sum, defendant's partial motion for summary judgment is granted in part and denied in part. The court grants in part summary judgment in favor of defendant on that part of plaintiffs'

cause of action asserting a violation for failure by defendant to submit an initial immediate emergency notice under § 11004(b). The court denies in part summary judgment on that part of plaintiffs' request for relief contained at paragraph four on page 27 of the complaint. Accordingly, plaintiffs' cause of action asserting a violation for failure by defendant to submit a follow-up notification under § 11004(c), along with the entirety of plaintiffs' request for relief, remains pending.

4.    Case Scheduling

The court lifts the stay of discovery and case deadlines imposed June 30, 2017, and directs the parties to file, within 14 days of the date of this order, a joint report proposing a plan for remainder of discovery in this case and new deadline(s) for dispositive motions. Thereupon, the court will enter such further order as is warranted regarding scheduling.

## CONCLUSION

Based on the foregoing, the court orders as follows:

1.    Plaintiffs' motion for partial summary judgment (DE 50) is DENIED.

2.    Defendant's motion, in part, for relief under Federal Rule of Civil Procedure 56(d) (DE 55) is DENIED AS MOOT.

3.    Defendant's motion, in part, for partial summary judgment (DE 55) is GRANTED IN PART AND DENIED IN PART. The court GRANTS IN PART summary judgment in favor of defendant on that part of plaintiffs' cause of action asserting a violation for failure by defendant to submit an initial immediate emergency notice under § 11004(b). The court DENIES IN PART summary judgment on that part of plaintiffs' request for relief contained at paragraph four on page 27 of the complaint. Accordingly, plaintiffs' cause of action

asserting a violation for failure by defendant to submit a follow-up notification under § 11004(c), along with the entirety of plaintiffs' request for relief, remains pending.

4.      The court DIRECTS the parties to file, within **14 days** of the date of this order, a joint report proposing a plan for remainder of discovery in this case and new deadline(s) for dispositive motions. Thereupon, the court will enter such further order as is warranted regarding scheduling.

SO ORDERED, this the 30th day of January, 2018.

LOUISE W. FLANAGAN
United States District Judge